Ronald B. SPARKS and Ruth
Sparks, Appellants,

v.

METALCRAFT, INC., Appellee.

No. 86–311.

Supreme Court of Iowa.

June 17, 1987.

Tyler C. Johnston of Joe Johnston Law Firm, Iowa City, for appellants.

Steven R. Regenwether and William M. Tucker of Phelan, Tucker, Boyle & Mullen, Iowa City, for appellee.

Considered by McGIVERIN, P.J., and LARSON, CARTER, WOLLE, and LAVORATO, JJ.

LAVORATO, Justice.

The plaintiffs, Ronald B. Sparks and Ruth Sparks, appeal from a summary judgment ruling dismissing their causes of action against Metalcraft, Inc. (Metalcraft) for injuries allegedly sustained by Ronald while working with solvents and tags manufactured by Metalcraft. Ruth's action is for loss of spousal consortium. The summary judgment disposed of the actions on the basis of the statute of limitations. A cause of action based on violation of the Federal Hazardous Substances Act (FHSA), 15 U.S.C.A. sections 1261–1276 (West Supp.1986), was dismissed earlier by the court as was Ruth's claim for loss of consortium based on that action. This dismissal is also the subject of this appeal. Because the district court was correct in both instances, we affirm.

Ronald was employed by the University of Iowa from October 1964 until August 8, 1980, as an inventory tagger. His job consisted of attaching identification plates on university-owned equipment. He did this by putting a liquid solvent on the back of a metal identification tag to activate adhesive on the tag, then pressing the tag to the equipment. Two different types of solvents were used in this procedure and both

were manufactured by Metalcraft. One solvent contained methylene chloride, and chlorinated hydrocarbons and esters. The other contained 1.1.1 trichloroethane.

In 1973 Ronald began complaining of fever, chilling, and severe headaches that he attributed to the solvents. Ronald sought medical attention for these symptoms from his personal physician, Dr. George S. Anderson. On that visit Ronald brought with him a can of one of the solvents. Dr. Anderson noted in his chart that Ronald seemed to have a number of headaches when exposed to the solvent.

Dr. Anderson referred Ronald to Dr. Maurice Van Allen for further evaluation. In his referral letter to Dr. Van Allen, Dr. Anderson noted that Ronald "has had headaches for several months without any gross findings. He is exposed to an activating solution in his work which has noxious fumes associated with it and he wonders whether this is contributing to his problem."

In April 1977 Ronald saw Dr. F.J. Kilpatrick at the University of Iowa's Environmental Health Service. Ronald asked the doctor about the possible toxicity of the solvent used in his job. Again, Ronald brought along a container of one of the solvents.

In a memorandum to the University, Dr. Kilpatrick noted that methylene chloride, a chemical listed on the container label, is "a moderately toxic substance. If inhaled or ingested in sufficient quantities it acts as a central nervous system depressant. It may also cause irritation of exposed skin and mucous membranes." He noted Ronald's complaints were characteristic of chronic methylene chloride intoxication. Dr. Kilpatrick suggested Ronald be advised to limit his exposure as far as possible by "wearing goggles, gloves and by keeping his head (breathing zone) as far as practical from surfaces where the solvent is applied."

In August 1980 Ronald was hospitalized with the diagnosis of heat exhaustion. That day he had worked in a very hot environment using the solvent.

The following month Dr. Bertram W. Carnow, director of the Great Lakes Center for Occupational Safety and Health, examined Ronald. In November Dr. Carnow wrote Ronald a five-page report. The report noted the purpose of the examination was to determine whether Ronald's occupation played some part in his symptoms of ill health dating back to the early 1960's. The report summarized those symptoms as generalized fatigue, heat intolerance, headaches, nausea, numbness of both feet, chest pains, and depression.

Dr. Carnow stated in his report that Ronald had brought with him two cans containing solvents Ronald used in his job. Both cans had the same trade name: "Adhesive Activity Solvent for Mounting Autographs" made by Metalcraft, Inc., of Mason City, Iowa. Methylene chloride, and chlorinated hydrocarbons and esters were listed as major ingredients on one can, and 1.1.1 trichloroethane was listed as a major ingredient on the other can.

In the report, Dr. Carnow informed Ronald that his symptoms appeared to be related to his sixteen-year exposure to the chemicals in the solvents. The doctor also informed Ronald that he found sensory and motor abnormalities suggesting the possibility of central nervous system damage because of Ronald's exposure to these chemicals. Dr. Carnow suggested neurological testing and advised Ronald that he should not be exposed to "this toxic material to any degree" in the future.

On November 23, 1981, the Sparkses filed a lawsuit against the State of Iowa and several University of Iowa employees as defendants. The nub of that lawsuit is that the University required Ronald, as part of his job, to use adhesives and solvents that were toxic, and as a result of the long exposure to these toxic materials, he suffered severe and permanent injuries. The adhesives and solvents referred to in the petition are the same as those that are the subject of the present lawsuit.

Sometime in 1983 in the course of discovery in the lawsuit, the Sparkses found, in the possession of the University, a document from Metalcraft describing the sol-

vents in question as nontoxic. The document also stated that "[p]rolonged exposure to fumes may cause nausea and headaches, but these symptoms quickly disappear upon access to fresh air."

In April 1984 a test performed on Ronald at the University of New Orleans showed that his blood contained a high level of trichloroethane. In July 1984 after reviewing this test and Ronald's medical and work history, Dr. Alan S. Levin opined in writing that Ronald

suffers from chemically acquired immune disregulation. The most probable cause of this disease process is the chemicals to which he was exposed occupationally.... I believe that the overwhelming reaction that Mr. Sparks suffered in August, 1980, was "the straw that broke the camel's back," and he will probably never completely recover from this incident.

The Sparkses filed the present lawsuit against Metalcraft on January 31, 1985. In this suit Ronald seeks damages for personal injuries allegedly resulting from his long-time exposure to the solvents manufactured by Metalcraft. His wife seeks loss of consortium because of Ronald's alleged injuries.

The petition alleges six causes of action: fraud and deceit, violation of the FHSA, negligence or gross negligence, express warranty, implied warranty of fitness for a particular purpose, and innocent misrepresentation.

In May 1985 the district court, the Honorable William R. Eads presiding, sustained Metalcraft's motion to dismiss the cause of action based on violation of the FHSA.

Subsequently, Metalcraft moved for summary judgment alleging the two-year statute of limitations for causes of action founded on personal injuries, Iowa Code § 614.1(2) (1983), precluded relief under any of the remaining actions alleged in the petition. Metalcraft supported its motion with answers to interrogatories and exhibits from the prior suit, which, it argued, established the Sparkses knew as early as 1977, if not before, that the solvents were manufactured by Metalcraft and believed the solvents were the source of their alleged injuries.

The Sparkses filed a resistance to the motion supported by an affidavit from Mrs. Sparks in which she essentially states that although she and Ronald suspected the solvents were causing his complaints, the treating doctors were not able to make a definitive diagnosis until 1984 when Dr. Levin diagnosed Ronald's condition as chemically acquired immune disregulation. In her affidavit, Mrs. Sparks also states neither she nor Ronald knew Metalcraft had represented to the University of Iowa that its product was nontoxic and that difficulties a person might experience from exposure to their product were temporary, until their attorney discovered this information in 1983.

In their brief and resistance to the motion for summary judgment, the Sparkses asserted the two-year provision found in section 614.1(2) applied to all their causes of action except fraud. As to the fraud action, they argued that the five-year provision found in section 614.1(4) applied. They further argued that the discovery exception to the statute of limitations, which was pleaded in the petition, applied to all their causes of action and that they were excusably unaware of their actions until July 1984 at which time their actions accrued and the statute of limitations began to run. Because their actions were brought approximately six months after they argued that all their actions were filed in a timely manner.

Finding as a matter of law that the actions were barred by the statute of limitations, the district court, the Honorable Larry J. Conmey presiding, sustained the motion for summary judgment. The court applied the discovery exception to all of the remaining actions pleaded except fraud. As to the fraud action, the court found that the University was aware of the toxic effect of the solvents as early as April 1977. Thus, the University was aware of any fraud that Metalcraft may have perpetrated on it by 1977, which was more than two years before the present suit was filed. As to the remaining actions, the court found

the Sparkses were aware the solvents were the cause of Ronald's medical problems at least by the time they filed suit against the University of Iowa on November 23, 1981, which again was more than two years before the present suit was filed.

On appeal the Sparkses challenge the summary judgment ruling, contending that they did generate a genuine issue of fact as to the statute of limitations in light of the discovery exception. They also contend the court erred in not applying the discovery exception to the fraud action and in finding that this action accrued in 1977 rather than in 1983, when the Sparkses discovered the document claiming the solvents were nontoxic. The Sparkses also challenge the earlier ruling dismissing their actions based on violation of the FHSA. In doing so, they contend they each have an implied right of action under this Act.

## I. *Statute of Limitations.*

Both parties now agree that the applicable statute of limitations as to all actions pleaded is the two-year provision in section 614.1(2) because all are based on injuries to the person. *See Franzen v. Deere & Co.,* 334 N.W.2d 730, 733 (Iowa 1983). The main issue in this appeal, therefore, is whether the Sparkses' causes of action were barred by the two-year statute.

Preliminarily, we begin our discussion with a statement of the principles governing the review of a summary judgment as summarized in *Knapp v. Simmons,* 345 N.W.2d 118, 121 (Iowa 1984):

Summary judgment is proper when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. The burden of showing the nonexistence of a material fact is upon the moving party. While an adverse party generally cannot rest upon his pleadings when the moving party has supported his motion, summary judgment is still not proper if reasonable minds could draw inferences and conclusions from the undisputed facts. In this respect, summary judgment is functionally akin to a directed verdict; every legitimate inference that reasonably can be deduced from the evidence should be afforded the nonmoving party, and a fact question is generated if reasonable minds can differ on how the issues should be resolved.

(Citations omitted.) The summary judgment record in this case contains the pleadings, affidavits, and exhibits. The Sparkses contend the record supports a finding of a genuine issue of fact on the applicability of the discovery rule in bar of Metalcraft's statute of limitations defense. Metalcraft counters by asserting the defense is established as a matter of law.

The resolution of the statute of limitations issue here is controlled by our interpretation of the discovery rule in relation to the evidence in the summary judgment record. Because the Sparkses are the parties resisting the summary judgment, we view the evidence in the light most favorable to them. Metalcraft had the burden to prove its limitations defense; the Sparkses had the burden to prove any exception to the ordinary limitations period. *See Neylan v. Moser,* 400 N.W.2d 538, 541 (Iowa 1987).

The Sparkses contend they did not discover the fraud and deceit action until 1983 when their attorney uncovered a document from Metalcraft to the University of Iowa in which it is claimed the solvents are nontoxic and the side effects from exposure to the solvents are temporary. The Sparkses further contend they did not discover their remaining causes of action until July 1984, when Dr. Levin diagnosed Ronald's condition as chemically acquired immune disregulation and tied the cause of that condition to Ronald's occupational exposure to the chemicals found in the solvents manufactured by Metalcraft.

Metalcraft asserts the University knew of the toxic effect of the solvents in 1977, and thus the statute of limitations began to run from that date on the fraud and deceit action. Metalcraft further asserts the Sparkses are charged with knowledge of their remaining causes of action at least as early as 1977 when Ronald saw Dr. Kilpatrick, but no later than November 1980

when Dr. Carnow issued his report based on his examination of Ronald.

The Sparkses argue a genuine issue of fact exists as to when, in the exercise of due diligence, they should have discovered their causes of action.

The question confronting us is simply this: when did the statute of limitations begin to run on the Sparkses' causes of action? In *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985), we pointed out that, under the discovery rule, "the statute of limitations begins to run when the injured person discovers or in the exercise of reasonable care should have discovered the allegedly wrongful act."

"The question in any given case is not, What did plaintiff know of the injury done him? but, What might he have known, by the use of the means of information within his reach, with the vigilance which the law requires of him?" *Chrischilles v. Griswold*, 260 Iowa 453, 462, 150 N.W.2d 94, 100 (1967).

In *Franzen* we explained that the statute of limitations does not begin to run until the injured person has actual or imputed knowledge of the *facts* that would support a cause of action. 377 N.W.2d at 662. We further explained that

[i]t is not necessary that the person know [these facts] are actionable. Knowledge of the facts and knowledge they are actionable are distinct and unrelated issues for purposes of the discovery rule.

*Id.* In support of this last quoted statement we relied on *Burd v. New Jersey Telephone Co.*, 76 N.J. 284, 291–92, 386 A.2d 1310, 1314 (1978).

In *Burd* a laborer sustained a heart attack on September 7, 1971, while working in a trench gluing together plastic pipe. In days prior to the heart attack, he felt dizzy, light-headed, angry, and mean while using the glue. These symptoms cleared up within an hour or so after leaving work. The plaintiff had read the caution on the can of glue to "avoid inhaling fumes." The plaintiff filed suit against the manufacturer of the glue on May 16, 1974, more than two years after his heart attack. The applicable statute of limitations in New Jersey is two years. New Jersey recognizes a discovery rule similar to Iowa's. The plaintiff contended the statute of limitations did not begin to run until October 1972 when his attorney received a medical report indicating a reasonable likelihood of a link between the glue and the heart attack. The court disagreed, finding that the statute of limitations began to run shortly after the heart attack when the plaintiff realized there was a connection between his symptoms and the glue. Holding as a matter of law that the plaintiff's action was barred, the court said in part:

[I]t is of no consequence whether the cause of action arises in the field of products liability or any other aspect of tort law.... The discovery principle modifies the conventional limitations rule only to the extent of postponing the commencement of accrual of the cause of action until plaintiff learns, or reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action. There is no suggestion in any of the leading cases in this area that accrual of the cause of action is postponed until plaintiff learns or should learn the state of the law positing a right of recovery upon the facts already known to or reasonably knowable by the plaintiff.... When the reported decisions speak in terms of the "discovery of the existence of the cause of action" the intended meaning is ... [that] the cause of action accrues when "the injured party discovers ... that he may have a *basis for* an actionable claim."

*Id.* at 291–92, 386 A.2d at 1314–15 (citations omitted).

In addition a person is charged on the date of the accident with knowledge of what a reasonable investigation would have disclosed. *Franzen*, 377 N.W.2d at 662. "The period of limitations is the outer time limit for making the investigation and bringing the action." *Id.* The statute begins to run when the person gains knowledge sufficient to put him on inquiry. On that date, he is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. *Id.*

Moreover, once a person is aware a problem exists, he has a duty to investigate even though he may not have exact knowledge of the nature of the problem that caused the injury. *Id.*

With these principles in mind we turn to the summary judgment record to determine when Ronald was put on inquiry that the solvents might be the cause of his physical ailments.

Dr. Carnow's report in November 1980 informed Ronald that his symptoms (generalized fatigue, heat intolerance, headaches, nausea, numbness of the feet, and weakness) may all be related to a sixteen-year exposure to the chemicals in the solvents manufactured by Metalcraft. The doctor also informed Ronald that he found "sensory and motor abnormalities suggesting the possibility that there has been some central nervous system damage as a result of exposure to these compounds (chlorinated hydrocarbons including methylene chloride, trichlorethylene and 1.1.1 trichloroethane)." In an answer to an interrogatory filed in the suit against the University of Iowa, the Sparkses stated they "became aware that Ronald's symptoms were related to his work on November 5, 1980, when they received Dr. Carnow's report." Dr. Carnow's report coupled with this answer to the interrogatory unequivocally suggests that the Sparkses were on inquiry as early as November 1980 that the chemicals were causing Ronald's physical complaints.

■ The unequivocal suggestion turned into conclusive reality when the Sparkses filed the lawsuit against the University of Iowa and several of its employees on November 23, 1981. In that lawsuit the Sparkses alleged that the solvents in question were toxic and as a result of his long exposure to them, Ronald suffered severe and permanent injuries. At least by this time the Sparkses admittedly had actual knowledge that the solvents were the cause of Ronald's injuries and knew Metalcraft manufactured the solvents. They also knew that Metalcraft had placed no warnings on the cans of solvents and that the solvents were toxic and could injure anyone inhaling them. Thus, the Sparkses had knowledge of sufficient facts upon which to posit an actionable claim against Metalcraft. These facts suggest two theories: negligence and strict liability predicated on the failure to warn of the toxic effects of the solvents that could cause serious injury. We therefore conclude the statute of limitations began to run on the Sparkses' causes of action against Metalcraft no later than November 23, 1981. Because the present suit was filed more than two years thereafter, it is barred by the statute of limitations.

In reaching this result, we have not overlooked the Sparkses' contention that their fraud action is predicated on a document uncovered in 1983 in their suit against the University of Iowa in which Metalcraft represented that the solvents were nontoxic and any side effects were temporary. The Sparkses would have us apply the discovery rule to a law action based on fraud and deceit and have us hold that the statute of limitations did not begin to run as to this action until 1983.

■ We need not decide whether the discovery rule applies to a law action of fraud and deceit because in our view the statute of limitations as to this action as well as the other actions pleaded began to run no later than November 23, 1981. The underlying purpose of the discovery rule is that a statute of limitations should not bar the remedies of claimants who have been excusably unaware of their rights to sue. *Franzen,* 377 N.W.2d at 662; *Flynn v. Lucas County Memorial Hosp.,* 203 N.W.2d 613, 616 (Iowa 1973). Such purpose would be thwarted if we allowed claimants to ignore the statute of limitations when it becomes obvious they have a basis for an actionable claim based on one or more theories of action, and then later permit them to sue when additional facts are uncovered supporting additional theories. We therefore hold that once claimants have knowledge of facts supporting an actionable claim they have no more than the applicable period of limitations to discover all the theories of action they may wish to pursue in support of that claim. One exception to this holding might be

fraudulent concealment by the defendant resulting in a claimant's failure to discover facts supporting a legal theory of action. In that event, the statute of limitations would only commence to run from the time the action was discovered, or might, by the use of diligence, have been discovered. *See Koppes v. Pearson*, 384 N.W.2d 381, 386 (Iowa 1986). However, the doctrine of fraudulent concealment has no application to this case because the Sparkses have acknowledged they are not relying on the doctrine. Accordingly, we have no reason to decide whether the doctrine would apply.

The district court did not err in concluding as a matter of law that the statute of limitations barred all the remaining causes of action pleaded by the Sparkses.

## II. *Implied Right of Action Under the FHSA.*

The Sparkses contend the earlier dismissal of that portion of their suit based on violation of the FHSA, 15 U.S.C.A. sections 1261–1276 (West Supp.1986), was error because there is an implied right of action under the Act.[1] Whether Congress intended a right of action in a federal statute when none is expressly provided depends on an examination of the following four inquiries set out in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26, 36 (1975):

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff?" Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?

(Citations omitted.) Since *Cort v. Ash*, only one appellate federal court has considered the precise issue confronting us.[2] *See Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894 (2d Cir.1981).

In *Riegel*, the court undertook an exhaustive analysis of the FHSA in light of the four *Cort* inquiries and concluded the Act does not imply a private right of action. *Id.* at 903. As to the first *Cort* inquiry, the court noted that by its terms

> section 1263 does not provide a private judicial remedy to a party injured by the introduction into interstate commerce of a banned or misbranded hazardous substance. The language simply prohibits

---

**1.** Section 1263 of the FHSA provides in pertinent part:

> The following acts and the causing thereof are prohibited:
> (a) The introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance.

The term "hazardous substance" is defined in section 1261(f)(1)(A) as "[a]ny substance or mixture of substances which (i) is toxic ..., if such substance or mixture of substances may cause substantial personal injury or substantial illness...." Section 1261(g) defines "toxic" as "any substance ... which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface." "Misbranded hazardous substance" is defined in section 1261(p) as "a hazardous substance (including a toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child ...) intended ... for use in the household or by children, if the packaging or labeling of such

substance [violates regulations promulgated pursuant to the Act] or if such substance ... fails to bear a label [meeting the requirements of this section]." "Banned hazardous substance" is defined in section 1261(q)(1) as "(A) any toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child ...; or (B) any hazardous substance intended, or packaged in a form suitable, for use in the household, which [is classified by regulation to be a "banned hazardous substance."]"

**2.** Prior to *Cort v. Ash*, one federal court said, without any analysis, that "[c]ivil recovery under [the FHSA] may be [implied] under appropriate circumstances" but went on to hold that the plaintiff had failed to state a claim for relief based on violation of the Act. *See Cross v. Board of Supervisors*, 326 F.Supp. 634, 638 (N.D. Cal.1968) (dismissal affirmed), *aff'd per curiam*, 442 F.2d 362 (9th Cir.1971).

such introduction. Thus, the language of section 1263 contrasts markedly with that of other statutes which the Supreme Court has stated expressly identify the classes Congress intended to benefit. *Id.* at 900. The court conceded that other sections of the Act, particularly section 1261(q)(1), which defines a "banned hazardous substance," demonstrate an intent to protect buyers of household products, and especially children for whom toys are purchased, but quickly concluded the plaintiff[3] was clearly not within such a class. *Id.;* see *Doane v. Metal Bluing Prods., Inc.,* 568 F.Supp. 744, 746 (N.D.N.Y.1983) (holding that *Riegel* foreclosed private right of action under FHSA as to *all* plaintiffs— mother of infant son who was poisoned had no implied right of action against manufacturer of product that son allegedly ingested causing his death).

Moving to the second inquiry under *Cort,* the *Riegel* court focused its attention on the legislative history of the FHSA to determine whether Congress intended to create or deny a private remedy.[4] The court found that the purpose of the FHSA was to "achieve nationwide uniformity in the regulation of certain hazardous products" and that its emphasis was "preventive, not remedial." *Riegel,* 649 F.2d at 901. The court concluded the history of the FHSA

demonstrates Congress' intent that the FHSA enforcement provisions parallel those of the Food, Drug and Cosmetic Act. Section 1263, which specifies that certain acts are prohibited, is "largely patterned after the corresponding section of the Federal Food, Drug and Cosmetic Act." The FHSA, as originally enacted, focused on the labeling of certain products, with enforcement solely through agency action, as in the Food, Drug and Cosmetic Act. In expanding the FHSA to allow for a direct ban on certain products where a cautionary label would not suffice to protect consumers, *the legislative history does not indicate a change*

*in the Congressional intent that enforcement be by the agency.*

*Id.* at 901 (emphasis added) (citations omitted).

Turning to the third inquiry under *Cort,* whether a private right of action is consistent with the underlying purpose of the legislative scheme, the court envisioned that multiple and unconstrained private suits under the FHSA would undermine the goal of a "coordinated regulatory program." *Id.* at 901. Allowing courts in private suits to determine on a case-by-case basis what is a "banned hazardous substance" would, in the court's view, result in inconsistency in enforcement. *Id.* at 902.

Finally, under the fourth *Cort* inquiry, the court noted that the plaintiff's claims, "grounded in product liability, negligence and breach of warranty, are traditionally the concern of state law" and "are no less viable because the products may also be regulated," factors militating against implying a private cause of action under the FHSA. *Id.* at 902–03.

We concur in the foregoing analysis and conclude the Sparkses have no implied right of action under the FHSA. Moreover, we doubt whether the FHSA has any applicability to this case. The petition alleges the solvents were used in the work place. The legislative history and wording of the statute make clear that the purpose of the statute is to require labeling for substances that will, in the ordinary course, be found in homes. *See Barnes v. Litton Indus. Prods., Inc.,* 555 F.2d 1184, 1186–87 (4th Cir.1977); 15 U.S.C.A. §§ 1261(q)(1), 1261(p), 1263 (West Supp.1986).

Finding no error as to either ruling of the district court, we affirm.

AFFIRMED.

---

**3.** A manufacturer of children's sleepwear sued a fiber manufacturer to compel repurchase of children's sleepwear treated with flame-retardant synthetic fiber considered by the Consumer Product Safety Commission to be a hazardous substance.

**4.** Recently, the Supreme Court stated this is the most important of the four *Cort* inquiries. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82, 95–96 (1979).