964 P.2d 176 (1998)
125 N.M. 605
1998-NMCA-111
Lydia MARTINEZ, Plaintiff-Appellee,
v.
SHOWA DENKO, K.K., a Japanese entity who may be incorporated and authorized to do business in the USA; Revco Discount Drug Centers, Inc., a Michigan corporation; and Doe Companies Nos. 1 through 50, inclusive, Defendants, and
Showa Denko America, Inc., a New York corporation, Defendant-Appellant.
No. 18870.
Court of Appeals of New Mexico.
July 13, 1998.
Certiorari Granted August 19, 1998.
*177 Luis G. Stelzner, Craig T. Erickson, Sheehan, Sheehan & Stelzner, P.A., Albuquerque, for Appellant Showa Denko America, Inc.
Daniel B. Silver, Steven J. Kaiser, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., of counsel for Appellant Showa Denko America, Inc.
Turner W. Branch, Margaret Moses Branch, Daniel R. Swiss, The Branch Law Firm, Albuquerque, for Plaintiff-Appellee.

OPINION
DONNELLY, Judge.
{1} Defendant Showa Denko America, Inc. pursues this interlocutory appeal from an order denying its motion for summary judgment. Two issues are raised on appeal: (1) whether the district court erred in determining that the statute of limitations in product liability cases does not begin to run until Plaintiff knew or reasonably should have known that the cause of her injuries was due to her use of an allegedly defective product; and (2) if so, whether the district court erred in applying the discovery rule to the instant case. Although we conclude that the district court correctly ruled that the discovery rule may be applied to product liability cases, for the reasons discussed herein, we reverse the order denying the award of summary judgment.

FACTS AND PROCEDURAL POSTURE
{2} Plaintiff consumed tablets manufactured by Defendant containing L-Tryptophan (LT), a dietary supplement, from approximately June 1989 until October or November 1989. In the fall of 1989 Plaintiff began experiencing flu-like symptoms, loss of appetite, fatigue, memory loss, lack of concentration, nausea, and a rash that developed over much of her body. She stopped taking the product in November 1989 because she suspected the tablets might be the source of her nausea and responsible for causing the rash. She advised a friend, Ginny Crespin, not to take LT because she believed it was what *178 "messed me up" and caused her to suffer from skin problems.
{3} In the latter part of 1989 Plaintiff learned that LT had been recalled, and both a sister and Plaintiff's son, Michael, called her attention to an article in the Albuquerque Journal that discussed the reasons underlying the recall of that product. Plaintiff's son also told her about a television report which discussed the recall of LT products. At her son's suggestion, she stopped taking LT. In the early part of 1990, Plaintiff first became aware of eosinophilia myalgia syndrome (EMS) its possible connection with LT, and learned that the symptoms associated with EMS were similar to the symptoms that she was currently experiencing.
{4} On January 22, 1990, Plaintiff saw Dr. Alvin Chester and showed him the bottle of LT tablets that she had been using. She reported to him that her hands and elbows were painful, that she had skin lesions, and that she felt nauseated. Dr. Chester gave Plaintiff a copy of a FDA Drug Bulletin which described the recall of LT products and some of the symptoms associated with the use of LT.
{5} On February 9, 1990, Plaintiff consulted Dr. Donald D. Harville, a dermatologist, about the rash she was experiencing. She told Dr. Harville she had been taking LT but had decided to discontinue using it. On February 17, 1990, she again saw Dr. Harville concerning her rash and described her symptoms to him. Dr. Harville made an initial diagnosis that Plaintiff was suffering from "[l]upus erythematosis, subacute cutaneous type" and noted that the "[r]elationship to L-Tryptophan [is] not clear at this time." He advised her to attend a dermatology conference at the University of New Mexico (UNM) wherein she could be examined by a number of other doctors.
{6} In January or February 1990 Plaintiff consulted an attorney in Albuquerque, New Mexico, about the possible connection between her use of LT and her symptoms. The attorney told her she should await the results of the dermatology examination at UNM and that it was possible to send her LT tablets to a laboratory for testing. When Plaintiff attended the dermatology conference at UNM, fifteen of the physicians confirmed Dr. Harville's initial diagnosis of lupus and the remaining three told Plaintiff that in their opinion there was a relationship between her use of LT and her symptoms. One of the three physicians at the dermatology conference, who thought Plaintiff's symptoms were related to her use of LT, told her he had a patient with similar symptoms and who had also taken LT.
{7} Following the dermatology conference, Dr. Harville again told Plaintiff that there was a possibility that there was a relationship between her symptoms and her use of LT, but believed her symptoms were caused by lupus erythematosis. Her attorney also told Plaintiff that, based on the results of the clinical observations at UNM, it was apparent most of the physicians who had examined her felt that her symptoms were apparently not due to her having taken LT.
{8} In December 1990 Dr. James B. Farrell examined Plaintiff and advised her that he believed she was suffering from lupus. On June 2, 1994, Plaintiff began receiving Social Security disability benefits based on the agency's determination that she was disabled due to dysthymic disorder and lupus erythematosis.
{9} In December 1991 Plaintiff was seen by yet another physician, Dr. Alicia Monroe. Dr. Monroe told Plaintiff that she did not believe that Plaintiff's blood tests supported the diagnosis of lupus. Approximately one and one-half years later, in August 1993, Plaintiff saw Dr. Solomon Brown, who prescribed oral steroids for her condition. Dr. Brown requested that Dr. Steve D. Ledesma give a second opinion on the proper course of treatment for Plaintiff. After examining her and reviewing her records, Dr. Ledesma stated that it was his impression that "[i]t is most likely that [Plaintiff] does and probably has a subacute cutaneous lupus type, which was diagnosed presumably by Dr. Harville[.]"
{10} In 1996 Plaintiff's son saw a television program, "Dateline," that broadcast a report about LT and EMS. He told Plaintiff about the matters discussed therein. The *179 "Dateline" program stated that EMS could result from ingesting LT. This information prompted Plaintiff to again consult with the same attorney she had consulted previously. The attorney told her he was not interested in taking the case but referred her to the Branch Law Firm. On or about April 2, 1996, the Branch Law Firm had the LT tablets tested at Hauser Laboratories and learned that they were contaminated. Plaintiff's new attorneys also had Plaintiff examined by Dr. Arthur M. Bobrove, a physician at Stanford University School of Medicine. Dr. Bobrove noted that, although there was previously debate "as to whether there was sufficient evidence to conclude that [Plaintiff] had lupus," it was his opinion that Plaintiff
suffers from not one, but two diseases both of which have been present since the fall of 1989; one a lupus skin disease and the other a systemic disease, eosinophilia myalgia syndrome (EMS). I cannot say what caused the former disease but the latter is the direct result of her having taken [LT].
Shortly after being advised of the test results and the report of Dr. Bobrove, Plaintiff filed a complaint on April 8, 1996, against Showa Danko, K.K. and other defendants alleging, among other things, that she had been injured due to Defendant's manufacture and sale of a defective product.
{11} Thereafter, on May 28, 1997, Defendant filed a motion for summary judgment, asserting that Plaintiff's claims were time barred under the statute of limitations. Following a hearing, the district court denied the motion, finding that the existence of a material factual issue precluded the granting of summary judgment.

DISCUSSION
{12} Defendant contends that the district court erred in applying the discovery rule based on Plaintiff's claims that she had sustained personal injuries resulting from Defendant's manufacture and distribution of an allegedly defective product. It argues that although the discovery rule has been held by New Mexico courts to apply to claims involving accounting, legal, medical malpractice, and latent injuries in workers' compensation cases, the rule has not been extended by Now Mexico courts to other types of litigation. See, e.g., Roberts v. Southwest Community Health Servs., 114 N.M. 248, 255-56, 837 P.2d 442, 449-50 (1992) (involving claim of medical malpractice claim); Brunacini v. Kavanagh, 117 N.M. 122, 129-30, 869 P.2d 821, 828-29 (Ct.App.1993) (involving claim of legal malpractice); Chisholm v. Scott, 86 N.M. 707, 709, 526 P.2d 1300, 1302 (Ct.App. 1974) (recognizing discovery rule in action involving malpractice claim against accountant); cf. Aragon v. Furr's, Inc., 112 N.M. 396, 399, 815 P.2d 1186, 1189 (Ct.App.1991) (in latent injury case involving injured worker, claim accrues when worker knows or should have known that accidental injury resulted in disability).
{13} Contrasted with the arguments of Defendant, Plaintiff asserts, however, that the trial court correctly determined that an individual who has been injured by the use of a product alleged to be defective is not barred from bringing a claim for her alleged injuries until she in fact knew or reasonably should have known the basis for her injuries.
{14} We first examine Defendant's contention that the discovery rule is inapplicable to product liability cases. Defendant points to language in Roberts which it asserts indicates that the discovery rule does not apply to cases except those involving claims of professional malpractice cases or litigation involving allegations of latent injury. See Roberts, 114 N.M. at 255, 837 P.2d at 449. In Roberts our Supreme Court recognized an exception to the general rule that the period of the statute of limitations runs from the time the injury manifests itself in a physically objective manner and is ascertainable. The Roberts Court, citing Chisholm, stated, "we believe that the rationale [in] Chisholm is applicable in cases ... in which the injury does not necessarily manifest itself at the time of the negligent act." 114 N.M. at 256, 837 P.2d at 450. Defendant urges this Court to construe the Supreme Court's ruling in Roberts so as to restrict the application of such rule to actions based on injuries claimed to have arisen from the use of defective products.
{15} We do not believe that our Supreme Court, in Roberts, intended to foreclose the *180 application of the discovery rule in situations involving product liability actions wherein the injury is not readily attributable to a party's use of a defective product. A majority of state courts that do not have discovery statutes and that have considered this issue, have recognized the applicability of the discovery rule in product liability cases involving disease or other types of latent injuries which are not immediately traceable to the use of a particular product or substance. See 4 Louis R. Frumer and Melvin I. Friedman, Products Liability § 26-04[2], at 26-39, 26-51 (Cary Stewart Sklaren rev.1998). As noted by the authors:
Most state courts that do not have discovery rule statutes, have applied the discovery rule in products cases involving diseases and other injuries. It has become the near-unanimous rule.
Despite this overwhelming majority rule, however, a few tribunals continue to reject it in certain circumstances and the Virginia Supreme Court rejects it outright. They have continued to hold that the cause of action accrues at the time of injury from a product.
Id. (footnote omitted).
{16} Similarly, as discussed in Sawtell v. E.I. Du Pont de Nemours & Co., 22 F.3d 248, 251 (10th Cir.1994) (citation omitted):
In most states ... a plaintiff's lack of knowledge of a product's defect causing personal injury affects the statute of limitations if a reasonably prudent and intelligent person could not, without specialized knowledge, have been made aware of such cause. In these cases, the cause of action begins to accrue when the injured person knew, or by the exercise of reasonable diligence should have discovered, the defect or the cause of the injury.
{17} In Sawtell the court noted that "[p]roducts liability suits are similar to medical malpractice suits: many jurisdictions have extended the discovery rule to products liability cases and [such] cases include many of the same policy concerns found in medical malpractice suits." Id.; see also Pennwalt Corp. v. Nasios, 314 Md. 433, 550 A.2d 1155, 1165 (1988) (holding discovery rule applicable to product liability actions). In recognizing the applicability of the discovery rule in product liability proceedings, the court in Pennwalt Corp. noted, "[t]his approach is consistent with that of other jurisdictions." Id. (citing Goodman v. Mead Johnson & Co., 534 F.2d 566 (3d Cir.1976); Rockstroh v. A.H. Robins Co., 602 F.Supp. 1259 (D.Md. 1985); Dawson v. Eli Lilly & Co., 543 F.Supp. 1330 (D.D.C.1982); Sparks v. Metalcraft, Inc., 408 N.W.2d 347 (Iowa 1987); Anthony v. Abbott Labs., 490 A.2d 43 (R.I. 1985)). See generally Jane Massey Draper, Annotation, Statute of Limitations: Running of Statute of Limitations on Products Liability Claim Against Manufacturer as Affected by Plaintiff's Lack of Knowledge of Defect Allegedly Causing Personal Injury or Disease, 91 A.L.R.3d 991 (1979).
{18} The rationale supporting to the recognition of the discovery rule in product liability cases is discussed by the editors in 4 American Law of Products Liability 3d § 47:17, at 35 (Timothy E. Travers, Managing Ed., et al., rev. Nov.1990) (footnote omitted):
Many jurisdictions have responded to problems presented by those cases involving diseases and injuries that do not manifest themselves until long after the plaintiff ceases to be exposed to a product, by enacting a rule of discovery, where the date on which the negligence was or should have been discovered controls the running of a statute of limitations, basing the rule on the fact that it is inconsistent with our system of jurisprudence to require a claimant to bring his cause of action in a limited time period in which, even with due diligence, he could not be aware that a cause of action even existed. Courts may apply a discovery rule when a plaintiff has no way of knowing that an injury has occurred until after the statute of limitations has expired and thus, no way of affixing or exploring potential liability within the statutory period.
{19} As observed by Justice Baca in Roberts, there are competing rationales for either applying a strict interpretation of the statute of limitations or applying a discovery rule, thus necessitating a conscious balancing of policies. See Roberts, 114 N.M. at 255-56, *181 837 P.2d at 449-50; see also Pierce v. Johns-Manville Sales Corp., 296 Md. 656, 464 A.2d 1020, 1026 (1983) (statutes of limitations are designed to balance the competing interests of potential parties as well as societal interests involved). Applying the same rationale utilized by our Supreme Court in Roberts, we conclude that the district court correctly determined that where an individual has been injured by an unsafe or defective product and the resulting injury does not immediately manifest itself, the three-year statute of limitations prescribed in NMSA 1978, § 37-1-8 (1976), commences when a plaintiff knows, or reasonably should know through diligent inquiry, that he or she has been injured. See Sawtell, 22 F.3d at 251 (noting similarity between medical malpractice actions and products liability suits, and concluding same rationale exists under New Mexico law for recognizing discovery rule in both types of action); Dawson, 543 F.Supp. at 1338 (discovery rule avoids unfairness of interpreting statute of limitations to accrue when injury occurs if at time plaintiff does not have enough information upon which to bring suit); Bonney v. Upjohn Co., 129 Mich.App. 18, 342 N.W.2d 551, 554 (1983); Anthony, 490 A.2d at 45, 46-48 (An individual "should have reasonable opportunity to become cognizant of an injury and its cause before the statute of limitations begins to run."); Hansen v. A.H. Robins, Inc., 113 Wis.2d 550, 335 N.W.2d 578, 583 (1983); see also Gaston v. Hartzell, 89 N.M. 217, 220, 549 P.2d 632, 635 (Ct.App.1976) ("[T]he law favors the right of action rather than the right of limitation.").
{20} Plaintiff argues that she did not have knowledge of a possible cause of action against Defendant until the defect in the product was discovered by her attorneys in 1996, and that she did everything a reasonable person would do to discover the cause of her medical problems. Thus, she contends it would be unfair to strictly apply the statute of limitations set forth in Section 37-1-8 under the circumstances existing here. She argues that she had been examined by numerous physicians and a majority of them had diagnosed her condition as a lupus-like disease. Plaintiff acknowledges that although she may have suspected in 1989 that LT was related to the symptoms she experienced, "she was not able to obtain a medical opinion to determine the connection with reasonable certainty during the same period." Although we agree with Plaintiff that the discovery rule should properly be extended to product liability cases, the rule does not aid Plaintiff under the uncontested facts herein. In 1990 Plaintiff learned at the dermatology conference at UNM that several physicians attributed her symptoms to her taking of LT. This was more than six years prior to the filing of her lawsuit herein.
{21} Plaintiff argues, however, that under a discovery rule, the time period for the running of the statute of limitations should not be held to commence until she received a definitive medical opinion indicating that her condition was due to taking LT or until she, in fact, learned of the results of the testing of the LT tablets. She contends that because a majority of the physicians diagnosed her condition as lupus, and she was found eligible for Social Security disability benefits based on a diagnosis of lupus erythematosis, she should not be charged with disputing the opinions of a majority of medical experts who had examined her.
{22} Even applying the discovery rule, in order to refute Defendant's prima facie showing that Plaintiff filed her lawsuit outside the time limitation of the statute of limitations, it was incumbent upon Plaintiff to demonstrate that if she had diligently investigated the problem she would have been unable to discover the cause of her injury. See McDaniel v. Johns-Manville Sales Corp., 542 F.Supp. 716, 718, 719 (N.D.Ill.1982) (awarding summary judgment where plaintiffs failed to present facts indicating "that had plaintiffs investigated the problem they would have been unable to discover their potential cause of action against [defendant]"). Here, the evidence is undisputed that Plaintiff suspected that the symptoms which she was experiencing were in part attributable to her having taken LT and that she stopped taking LT in late 1989 because she believed that LT could well be the basis for her physical problems. Plaintiff does not dispute that she advised a friend, Ginny *182 Crespin, in November 1989 that she should not take LT because Plaintiff felt that LT had caused her to suffer from skin problems. As noted above, Plaintiff was also aware that in February 1990 three doctors at the dermatology conference she attended indicated they attributed her symptoms to LT; that in 1990 she was told about a newspaper article in the Albuquerque Journal revealing the growing public awareness of the dangers of taking LT; that Plaintiff's husband told her that he believed there was a connection between her ingestion of LT and her resulting symptoms; and that Plaintiff testified that "[m]y husband would always tell me [my symptoms started when I began taking LT]", and that he "`noticed it when you started taking those, you started like going downhill. You didn't benefit from them.'" Plaintiff also testified that when she read the article in the Albuquerque Journal that her sister had given her about the symptoms experienced by individuals who had taken LT, it was "like they had [written] a story about me." Plaintiff described hair loss as one of the symptoms reported in the newspaper article which could result from the use of LT. She stated that in October 1989 she also experienced hair loss. In describing her efforts to pinpoint the cause of her problems, Plaintiff does not dispute the fact that some of the doctors she consulted believed that there was a relationship between her use of LT and her symptoms.
{23} Moreover, as discussed above, in January or February 1990, Plaintiff was told by a pharmacist that LT had been recalled and that, thereafter, she consulted an attorney about the possible connection between her use of LT and her condition, and the attorney advised her that they could have her LT tablets tested to determine if they could be a cause of her problems. Additionally, Dr. Harville told Plaintiff in early 1990 that it was possible her condition was related to her use of LT. Despite the fact that Plaintiff admitted that during "the first part of 1990" she learned about EMS and that she began to experience the symptoms attendant to EMS after she took LT, she did not have the LT tablets remaining in her possession tested until 1996.
{24} As a general rule, the mere fact that there is a divergence of medical opinions among physicians concerning the cause of an individual's ailment does not preclude or toll the running of the statute of limitations. As observed in American Law of Products Liability 3d, supra § 47:42, at 75, if "the plaintiff knows or should have reasonably known of the general nature and extent of an injury, the running of a statute of limitations is not delayed if there are differing medical opinions regarding whether the plaintiff has incurred a particular medical condition." Although we are sympathetic to Plaintiff's situation, nothing in the discovery rule serves to suspend the running of the statute of limitations merely because there are divergent medical opinions concerning the nature or cause of her illness or injuries. As observed by the court in Bell v. Showa Denko K.K., 899 S.W.2d 749, 754 (Tex.Ct. App.1995):
Because of the discovery rule's requirement of reasonable diligence, the tolling of the applicable statute of limitation by the rule ends when the person claiming the benefit of the rule acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action. This is so because the knowledge of such matters is, in the law, equivalent to knowledge of the cause of action itself for limitation purposes.
{25} Under the circumstances shown here, the district court erred in denying Defendant's motion for summary judgment. Even applying the discovery rule, we hold as a matter of law that the information known by Plaintiff concerning the possible connection between her condition and her use of LT was sufficient to activate the commencement of the statute of limitations more than three years before the filing of her complaint. The information she received from her family, newspaper articles, several doctors, and her prior attorney concerning LT and its possible connection with her injuries constituted sufficient information which would put a reasonable person on notice and a duty to timely initiate a claim. See Vaught v. Showa Denko *183 K.K., 107 F.3d 1137, 1141-42 (5th Cir.1997) (defendant's motion for summary judgment affirmed; statute of limitations began running when plaintiff read newspaper article, learned her symptoms were similar to that described, prompting her to contact an attorney); Gnazzo v. G.D. Searle & Co., 973 F.2d 136, 138 (2d Cir.1992) (upholding award of summary judgment on basis that statute of limitations against manufacturer of IUD began to run when plaintiff suspected device caused her infertility, not when she received diagnosis); Fidler v. Eastman Kodak Co., 714 F.2d 192, 198-99 (1st Cir.1983) (discovery rule did not bar running of statute of limitations and summary judgment affirmed where plaintiff had reason to know of causal relationship between her injuries and defendant's product); Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923, 928-30 (1988) (en banc) (statute of limitations began to run when plaintiff suspected DES was a defective drug); Gray v. Reeves, 76 Cal. App.3d 567, 142 Cal.Rptr. 716, 722 (1977, as modified Jan. 6, 1978) (affirming summary judgment based on statute of limitations); Wood v. Gibbons, 38 Wash.App. 343, 685 P.2d 619, 622 (1984) (summary judgment upheld; statute of limitations began to run when plaintiff became aware of possible connection between malpractice and injuries suffered by him); cf. Schear v. Board of County Comm'rs, 101 N.M. 671, 672, 687 P.2d 728, 729 (1984) (whether duty exists is generally a question of law).

CONCLUSION
{26} For the reasons discussed herein, the order denying summary judgment is reversed and the cause is remanded with instructions to dismiss Plaintiff's complaint against Defendant.
{27} IT IS SO ORDERED.
WECHSLER and BUSTAMANTE, JJ., concur.