George Louis KRACIUN, Sr. and Phyllis Ann Kraciun; Thomas F. Kennedy and Bernice Alma Kennedy; David E. Loehndorf and Jacquelyn Mae Loehndorf; Donald L. Snook and Jean M. Snook; Robert E. Lilly and Marlene F. Lilly; John F. Kenney and Ursula Kenney, Appellants,

v.

OWENS–CORNING FIBERGLAS CORPORATION; The Celotex Corporation; Eagle–Picher Industries, Inc.; Armstrong World Industries, Inc.; GAF Corporation; Keene Corporation; Pittsburgh Corning Corporation; Raymark Industries, Inc.; Owens–Illinois, Inc.; H.K. Porter Company, Inc.; Fibreboard Corporation; Carey Canada, Inc.; The Allied Corporation; Garlock, Inc., Appellees.

No. 88–2838.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1989.

Decided Jan. 31, 1990.

Rehearing Denied March 6, 1990.

Charles S. Siegel, Dallas, Tex., for appellants.

David B. Mueller, Peoria, Ill., for Garlock and Karen L. Kendall.

Before MAGILL, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

▮ Plaintiffs Louis and Phyllis Kraciun, Thomas and Bernice Kennedy, David and Jacquelyn Loehndorf, Donald and Jean Snook, Robert and Marlene Lilly, and John and Ursula Kenney appeal from the district court's grant of summary judgment based on the magistrate's report and recommen-

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

dation that Iowa's two-year statute of limitations for personal injury actions barred their claims against various manufacturers of asbestos-containing insulation products. Louis Kraciun, Thomas Kennedy, David Loehndorf, Donald Snook, Robert Lilly, and John Kenney alleged they were exposed to defendants' products as long-time workers at the E.I. du Pont de Nemours & Co. plant in Clinton, Iowa. Because we hold there are genuine issues of fact concerning when five of the six plaintiffs knew or reasonably should have known they had suffered an asbestos-related injury, we reverse the district court's order in part and remand for further proceedings.

## I.

▮ Defendants are entitled to summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Defendants assert there is no genuine issue of material fact concerning a valid defense to plaintiffs' personal injury claims, namely, that their actions were not filed within Iowa's two year statute of limitations. *See* Iowa Code § 614.1(2).

Plaintiffs filed their complaints in September, 1986. They claim the benefit of Iowa's "discovery rule," and argue the statute of limitations did not commence until they learned or reasonably should have learned of facts that would support a cause of action. *See Kendall/Hunt Publishing Co. v. Rowe*, 424 N.W.2d 235, 243 (Iowa 1988); *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 351 (Iowa 1987). Because the "discovery rule" is an exception to the normal limitations period, plaintiffs have the burden of pleading and proving its application. *Kendall/Hunt*, 424 N.W.2d at

243; *Franzen v. Deere & Co.*, 334 N.W.2d 730, 732 (Iowa 1983).

In responding to defendants' summary judgment motion, plaintiffs are thus required to point to specific facts showing there is a genuine issue for trial concerning when their causes of action accrued. Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The district judge's function, and ours, is to review the evidence presented in the light most favorable to the plaintiffs as the nonmoving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Hines v. A.O. Smith Harvestore Products, Inc.*, 880 F.2d 995, 997 (8th Cir.1989).

The underlying rationale of the "discovery rule" is that a statute of limitations should not bar the remedies of claimants who have been excusably unaware of their rights to sue. *Sparks*, 408 N.W.2d at 352. Courts and commentators have been virtually unanimous in their endorsement of such a rule in toxic substances cases, although the precise formulation of the rule varies from jurisdiction to jurisdiction. *See* M. Green, *The Paradox of Statutes of Limitations in Toxic Substances Litigation*, 76 Cal.L.Rev. 965, 977–79 (1988).[1]

We are concerned in this case with Iowa's application of the discovery rule. Under Iowa law, plaintiffs are charged not only with any actual knowledge they possessed concerning the facts underlying their causes of action, but also with "knowledge of what a reasonable investigation would have disclosed." *Sparks*, 408 N.W.2d at 351.

> The statute begins to run when [a] person gains knowledge sufficient to put him on inquiry. On that date, he is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation.... [O]nce a person is aware a problem exists, he has a duty to investigate even though he may not have exact knowledge of the nature of the problem that caused the injury. *Sparks*, 408 N.W.2d at 351–52.

In *Sparks v. Metalcraft, Inc.*, the Iowa Supreme Court affirmed a grant of summary judgment against plaintiff Sparks, holding Sparks had knowledge of sufficient facts upon which to posit an actionable claim against a solvent manufacturer no later than November 23, 1981. In 1980, Sparks admitted he was told by his physician, Dr. Carrow, that chemicals in a solvent Sparks used in his job were causing his physical symptoms of fatigue, heat intolerance, headaches, nausea, numbness of the feet, and weakness. The court ruled Dr. Carrow's report, coupled with plaintiff's admission that he became aware of the cause of his symptoms in 1980, "unequivocally suggests that the Sparkses were on inquiry as early as November, 1980 that the chemicals were causing Roland's physical complaints." *Id.* at 352. In selecting November 23, 1981 as the beginning of the limitations period for purposes of deciding defendant's summary judgment motion, the Court noted that on that date plaintiff had sued his employer, alleging in the complaint that the solvent was the cause of his injuries; that Metalcraft manufactured the solvent; that Metalcraft had placed no warnings on the cans of solvent; and that the solvents were toxic. *Id.*

The *Sparks* Court relied upon an earlier Supreme Court decision, *Franzen v. Deere & Co.*, 377 N.W.2d 660 (Iowa 1985), in reaching this result. *Franzen* involved a suit by an individual who was injured while working inside a forage wagon manufactured by Deere & Co. Plaintiff Franzen knew what caused his injury immediately after it had occurred: an apron on the floor of the forage wagon suddenly moved, which carried plaintiff's arm into a revolving beater mechanism. *Id.* at 661, 663. Shortly after the injury, plaintiff made a

---

**1.** Some critics of the rule have charged it tends to require additional, difficult fact-finding which increases the cost of litigation. *See* M. Green, *The Paradox of Statutes of Limitations in Toxic Substances Litigation*, 76 Cal.L.Rev. 965, 977 n. 58 (1988).

claim against the farmer who owned the forage wagon. *Id.* at 662.

Plaintiff's suit against the manufacturer of the wagon was not brought until 1982, three years after the accident occurred. In affirming the district court's grant of summary judgment, the Iowa Supreme Court distinguished cases in which plaintiff's due diligence was a question of fact. 377 N.W.2d at 663–64. *See, e.g., Baines v. Blenderman,* 223 N.W.2d 199, 201–03 (Iowa 1974).[2] The *Franzen* Court also noted cases in which questions of fact arose concerning the cause of a plaintiff's injury, stating specifically that "uncertainty concerning causation has been recognized in asbestosis cases." 377 N.W.2d at 663.

In *Foster v. Johns–Manville Sales Corp.,* 787 F.2d 390 (8th Cir.1986), this Court held summary judgment was inappropriate in an asbestos action based in large part on the *Franzen* Court's citation to *Sahlie v. Johns–Manville Sales Corp.,* 99 Wash.2d 550, 663 P.2d 473 (1983), a Washington Supreme Court asbestos case, and *King v. Seitzingers, Inc.,* 160 Ga.App. 318, 287 S.E.2d 252 (1981), another latent disease case (lead poisoning caused by inhalation of fumes from a battery plant). *See* 787 F.2d at 392–93. In *Foster,* we stated:

"Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case.... When conflicting inferences can be drawn from the facts, summary judgment is inappropriate."

*Id.* at 393 (citation omitted).[3] *See Hines v. A.O. Smith Harvestore Products, Inc.,* 880 F.2d 995, 998–99 (8th Cir.1989); *Hildebrandt v. Allied Corp.,* 839 F.2d 396, 399–400 (8th Cir.1987).

## II.

Thus, while Iowa law places plaintiffs on "inquiry notice" once they gain sufficient knowledge that a problem exists, summary judgment is appropriate in the cases now before the Court if a reasonable jury could *only* conclude, viewing the facts in the light most favorable to the plaintiffs, that plaintiffs knew or through reasonable investigation should have known they were suffering from an asbestos-related injury prior to September, 1984. To make this determination, we turn to the record before us.

Plaintiffs are long-time du Pont employees. It is undisputed that during the course of their employment, they were exposed to asbestos dust in sufficient quantities to cause disease, primarily through contact with the asbestos insulation which surrounded numerous pipes and boilers in the du Pont plant.[4] Because public aware-

---

**2.** Defendants have cited a recent Iowa Supreme Court case, *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235 (Iowa 1988), in which the Court found substantial evidence supported the district court's factual finding that plaintiff was on "inquiry notice" of defendant's breach of fiduciary duty more than five years prior to bringing its claim. *Id.* at 243–44. A finding of substantial evidence to support a fact found after trial is, of course, far different from a finding that no question of fact exists.

**3.** Defendants correctly point out that *Foster* was decided without the benefit of recent Supreme Court cases defining more specifically the obligation of the nonmoving party to produce evidence which demonstrates there is a genuine issue for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). We need not decide whether *Foster* would have been decided differently under the standards for summary judgment we apply today.

**4.** The term asbestos refers to a group of mineral silicates which have in common a fibrous struc-

ture and a potential to be woven. AMA Council on Scientific Affairs, *A Physician's Guide to Asbestos–Related Diseases,* 252 JAMA 2593, 2593 (1984); *Cecil Textbook of Medicine,* 2362 (1988). Worldwide use of asbestos increased dramatically throughout most of this century before beginning to decline in the late 1970s. *Textbook of Medicine,* at 2362.

Occupational exposure to high levels of asbestos may occur in mining and milling of the ore, the manufacture and use of asbestos-containing products, and the repair and demolition of structures containing asbestos. Insulators and construction workers are particularly at risk. *Id.; A Physician's Guide,* at 2593. In promulgating regulations for occupational exposure to asbestos in 1986, the Occupational Safety and Health Administration stated it was "aware of no instance in which exposure to a toxic substance has more clearly demonstrated detrimental health effects on humans than has asbestos exposure." Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 51 Fed. Reg. 22,612, 22,615 (1986).

ness of the hazards of asbestos is of relatively recent origin, virtually no steps were taken to protect du Pont workers from asbestos exposure prior to the early 1980s. In 1980 or 1981, Mel Gauss, du Pont's environmental coordinator, held meetings to inform du Pont maintenance employees of the hazards of exposure to asbestos and the methods and equipment which should be used to help prevent further asbestos exposure. Five of the six plaintiffs attended one of the Gauss lectures on asbestos. Although Gauss testified he indicated at each meeting some of the potential physical problems which could result from inhaling asbestos, he gave no instructions concerning what employees should do if they were concerned that they might have some asbestos-related symptoms.

In addition to attending a Gauss lecture, plaintiffs each met with a physician during their annual physical check up, routinely performed by the du Pont plant physician. The only plant physician whose testimony appears in the record is Dr. James Young, du Pont's plant physician from 1965 through 1980. Young was a general practitioner who was not terribly familiar with asbestos. He could not recall *ever* relating any abnormality he observed on an employee's x-ray prior to 1980 with an asbestos-related disease. Dr. Young was involved in du Pont efforts in 1980 to further screen the x-rays of certain employees, however, and sent selected x-rays to a radiologist at du Pont's headquarters in Wilmington, Delaware for further review. Dr. Young also selected a clinic in Cincinnati for potential followups, because he was told by another physician at du Pont that the clinic was "the only place in the country that was qualified to check on asbestosis." [5] Dr. Young interpreted the results of the Cincinnati tests for several of the plaintiffs herein.

**5.** Dr. Merchant, the physician who diagnosed plaintiffs' asbestos-related injuries in 1986, agreed that radiologists or physicians who are not specially trained often do not report or identify pleural thickenings or changes unless "they feel very confident that this is a full-blown disease."

**6.** Individuals exposed to asbestos are generally counseled to stop smoking because the synergis-

While the parties have provided us with little information on the nature of asbestos-related injuries, medical authorities appear to agree that people differ markedly in their response to asbestos fibers. *See generally* AMA Council on Scientific Affairs, *A Physician's Guide to Asbestos–Related Diseases,* 252 JAMA 2593, 2594 (1984). Inhalation of fibers generally produces some degree of change in lung tissue, but inhalation may or may not produce deleterious results depending on many factors, including the length of continued exposure and the general health of the worker. *Id. See Stagg v. Bendix Corp.,* 472 A.2d 40, 42 (Del.Super.Ct.), *aff'd,* 486 A.2d 1150 (Del. 1984).

Asbestos can cause a broad range of clinical disorders, the most serious of which include asbestosis, a form of pulmonary fibrosis; mesothelioma, a rare disease which generally causes death shortly after diagnosis; and lung cancer. *See A Physician's Guide,* at 2594; *Cecil Textbook of Medicine* 2362 (1988); Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 51 Fed.Reg. 22,612, 22,615–16 (1986). Most disorders have a long latency period and are difficult to diagnose in the early stages. *See* Exposure to Asbestos, 51 Fed.Reg. at 22,621; *Cowgill v. Raymark Industries, Inc.,* 780 F.2d 324, 330 (3d Cir.1986). Diagnosis is further complicated in smokers, because cigarette smoke causes its own lung problems. *A Physician's Guide,* at 2594; *Cowgill,* 780 F.2d at 330 & n. 4.[6] At least one commentator has stated that diagnosis is "almost always an uncertain enterprise," because of "[l]ack of understanding of biological and physiological mechanisms, absence of serious dysfunction, and the slowly progressive nature of some diseases." M. Green, *supra,* 76 Cal.L.Rev. at 975–76.[7]

tic effect of cigarette smoke and asbestos exposure greatly increases the risk of lung cancer. *A Physician's Guide,* at 2596.

**7.** *See also* Exposure to Asbestos, 51 Fed.Reg. at 22,621 (diagnosis of asbestosis "is subject to differences in interpretation, resulting in both false negative and false positive conclusions"). Unfamiliarity by many health-care practitioners also results in misdiagnoses. M. Green, *supra,*

## III.

With this background in mind, we review the evidence of record with respect to each plaintiff to consider whether this evidence, viewed in the light most favorable to the plaintiffs, is sufficient to place them on "inquiry notice" of an asbestos-related injury prior to September, 1984.

### A. Louis Kraciun

Kraciun was employed by du Pont from 1951 through 1982.[8] He was exposed to asbestos as a member of the service crew, assisting the pipe coverers and carpenters who worked directly with asbestos insulation. Kraciun's medical records reveal no significant health problems at the time he started work with du Pont, although he was overweight, had a tendency to have high blood pressure, and had mild diabetes. He smoked cigarettes, but quit in the early 60s. His chest x-rays through Dr. Young's retirement in 1980 were normal. Dr. Young testified he never had any conversation with Kraciun concerning any lung abnormalities.

Kraciun retired from du Pont in 1982. Du Pont's medical records contain chest x-rays taken in 1982 and 1984. No testimony from the doctors who ordered or interpreted these x-rays appears in the record. When shown the 1982 x-ray during his deposition, Dr. Young read the x-ray report as showing "very minimal lateral chest wall pleural thickening present bilaterally, but still essentially normal chest."[9] He also found evidence of pleural thickening in the 1984 x-ray. Kraciun testified that one doctor "said that he could see something on my lung but he didn't know what it was.... [B]ut he said, 'Don't worry about

it. It [doesn't] look bad,' you know." Kraciun testified further that he later asked a different doctor about it, and this doctor also told him "don't worry about it." There is no evidence in the record that any physician ever identified the "something" as pleural thickening nor did any physician link the "something" to asbestos exposure.

Kraciun received a letter from his union after retirement, informing him of a program to test former employees who had been exposed to asbestos products at du Pont. Kraciun was examined by Dr. Merchant in 1986 through this program. According to Kraciun, Dr. Merchant was the first physician to inform him of any pleural thickening, and the first to relate that thickening to asbestos exposure. At the time of his deposition in 1987, Kraciun stated his activities were limited because of a "lack of zip" or tiredness, and he complained of being "short-winded." Kraciun testified his condition seemed to be getting progressively worse.

The magistrate and district court concluded the statute of limitations for Kraciun's cause of action began to run in 1982, when, according to the magistrate, "Mr. Kraciun had knowledge of his pleural thickening." The magistrate found Kraciun knew asbestos was in the du Pont plant in 1980 because he was generally aware of tests other workers in the plant were being given at that time. Kraciun acknowledged he had become generally aware of the hazards of asbestos through articles in the newspaper in the early 1980s,[10] and the district court and magistrate apparently concluded that this knowledge, plus the x-ray findings, placed Kraciun on "inquiry

76 Cal.L.Rev. at 976 & n. 49. One of the plaintiffs involved in this appeal, plaintiff Lilly, appears to have been misdiagnosed as suffering from mesothelioma in 1977. *See* note 15 *infra.*

8. Kraciun graduated from high school in 1942. He joined the Navy shortly thereafter and held several other jobs upon discharge in 1946 before joining du Pont in 1951.

9. Both Dr. Young and Dr. Merchant testified that pleural thickening involves a scarring of the pleura or lining of the lung. Asbestos exposure is only one of several possible causes of

pleural thickening: pleural thickening "is highly suggestive of asbestos exposure when other possible causes, such as trauma, surgery, and infection, are excluded." *A Physician's Guide,* at 2595. "Patients with only pleural involvement are usually asymptomatic and have normal pulmonary function," although patients with extensive pleural thickening may have difficulty breathing. *Textbook of Medicine,* 2363.

10. Kraciun is the only plaintiff who did not attend a Mel Gauss lecture on asbestos.

notice" of an asbestos-related injury in 1982.[11]

## B. Thomas Kennedy

Kennedy began work at du Pont in 1953 after his graduation from high school. With the exception of time spent in the Navy from 1954 through 1958, he has worked continuously at du Pont since that time. Kennedy was exposed to asbestos as a machine operator when the brakes on his machine were cleaned out and as a pipe fitter. He smoked cigarettes from 1953 to the early 60s. Dr. Young saw Kennedy from 1966 to 1980. Young testified Kennedy's health was generally good, although he was overweight and had high blood pressure. His chest x-rays were normal through 1980. In October, 1980, Kennedy's x-rays were sent to Wilmington for further study. Dr. Young met with Kennedy after the review and told him he would be sent to a clinic in Cincinnati for follow up on the x-rays.

At the clinic, doctors asked Kennedy about his exposure to asbestos and Kennedy learned they would be looking for evidence of asbestos in his lungs. Upon his return from Cincinnati, Kennedy met with Dr. Young in December, 1980. Dr. Young testified that he told Kennedy the x-rays contained evidence of pleural plaques[12] consistent with asbestos exposure,[13] but these findings would not progress, and would not cause him any disease, symptoms, or disability in the future. Kennedy agreed that Young informed him that his lungs showed "asbestos exposure," although he testified he was not specifically informed of the plaques. Kennedy felt "relieved" after his meeting with Young, because Dr. Young had told him he had no problems that required further medical attention or concern. "I thought I was a healthy young man."

After his return from Cincinnati, Kennedy participated in a meeting conducted by Mel Gauss. Kennedy continued to have annual physical exams, and testified that no doctor ever informed him of any problem relating to asbestos exposure until he saw Dr. Merchant in 1986 as a result of the union-sponsored program Kraciun had participated in. In his deposition, which was taken in 1987, Kennedy testified that he now experiences a shortness of breath when climbing steps and performing routine maintenance jobs at the plant. Kennedy believes his lung condition has progressively deteriorated.

The magistrate found Kennedy's breathing problems began in 1984, but concluded the statute of limitations began to run in 1980, because he was informed in 1980 that his x-rays revealed "asbestos exposure." The district court concluded only that Kennedy and his wife "had knowledge of [his] pleural disease and, with the exercise of reasonable care, they should have discovered the allegedly wrongful act on which they base this lawsuit" prior to September, 1984.

11. The magistrate made brief "findings of fact" in each case, clearly an inappropriate function in connection with a motion for summary judgment. The district court relabeled the facts so found as "facts on which the summary judgment record discloses no genuine material issue," and without further reference to the record or the "facts" found by the magistrate, concluded Louis Kraciun had knowledge of his pleural thickening more than two years before the action was commenced and, with the exercise of reasonable care, should have discovered the allegedly wrongful act on which he based his claims.

12. Dr. Merchant testified that pleural plaques may evolve from pleura which has thickened: plaques are a localized "hardening" or calcification of the pleura. See A Physician's Guide, at

2595. Pleural thickening can develop with or without localized plaques. Id. Like pleural thickening, plaques often produce no symptoms. "The major significance of pleural plaques is that their appearance on a chest radiograph confirms a history of exposure." Textbook of Medicine, at 2363.

13. The tests in Cincinnati apparently were conducted by Dr. Brooks. Based on du Pont records, Dr. Young testified Dr. Brooks felt Kennedy had "pleural disease most likely on the basis of asbestos exposure." Dr. Brooks apparently also noted some air trapping on the pulmonary function test, which could be an indicator of early obstructive pulmonary disease from cigarette smoking. The only physician to discuss the results of the Cincinnati tests with Kennedy, however, was Dr. Young.

## C. Donald Snook

Snook worked for du Pont from 1948 through 1985,[14] when he retired as part of a reduction in force at the company. He was exposed to asbestos as a member of the service crew, as a general maintenance worker working with pipes, and as an electrical maintenance worker cleaning out brakes. Snook smoked cigarettes "very lightly for probably a year" in the 1960s. Dr. Young testified Snook was in generally good health. In 1980, his x-rays showed possible pleural thickening, although his report at the time according to Dr. Young was read by Dr. Schmuck as normal. Dr. Young testified he met with Snook and informed him he had some pleural thickening which could be compatible with asbestos exposure. Snook was sent to Cincinnati for further tests, although the results from Cincinnati showed no definite evidence of pleural plaque or asbestosis and only possible pleural thickening, which according to Dr. Young was "not diagnostic."

In meeting with Snook to discuss the Cincinnati results, Young testified he told Snook he had no asbestos related problems as long as he did not start smoking again. In Dr. Young's view, Snook was not at that time suffering any damage in any way from his exposure to asbestos. Snook recalled Dr. Young meeting with him to discuss "a slight shadow" on his lung, which Dr. Young said only that they would watch every year. No physician at du Pont since 1980 informed Snook of any asbestos related problem until Snook participated in his union's program and saw Dr. Merchant in 1986.

In his deposition taken in 1987, Snook testified concerning breathing difficulties which have gradually worsened in the last three or four years. In addition to restricted activities because of his shortness of breath, he now has a cough and a considerable amount of phlegm in his throat. The magistrate found the statute of limitations began to run in 1980, when Snook was informed of the pleural thickening, despite Dr. Young's testimony that Snook was not at that time suffering any damage as a result of his asbestos exposure and despite Snook's testimony that he was not sure Dr. Young ever identified the "shadow" as "pleural thickening." The district court stated only that Snook and his wife "had knowledge of Donald L. Snook's pleural thickening and, with the exercise of reasonable care, they should have discovered the allegedly wrongful act on which they base this lawsuit" more than two years before the action was commenced.

## D. Robert Lilly

Lilly was employed by du Pont from 1952 through 1985. He worked throughout the plant in numerous positions, and was exposed to asbestos primarily as a maintenance person working with the pipes. Lilly smoked until the early 1970s. He was told by Dr. Young in 1966 to stop smoking, to go on a low cholesterol diet, and to exercise to reduce his high blood pressure. He had no significant problems with his lungs until 1977, when he began to feel significant pain anytime he would breathe hard or cough. He was hospitalized at Jane Lamb Hospital with a diagnosis of pleurisy, an inflammation of the chest wall lining. Dr. Young testified this condition was not in any way related to asbestos exposure.

When Lilly's condition did not improve, he was sent to the Mayo Clinic in Rochester, Minnesota. Physicians there differed in their diagnoses. Both Lilly and Dr. Young referred to it as a collagen-type problem or a connective tissue disorder, for which Lilly took Prednisone, a cortisone-like medication. In Dr. Young's opinion, Lilly had a rheumatoid arthritis which had nothing to do with asbestos exposure. Dr. Young testified no doctor at any time to his knowledge told Lilly his lung problems were related to asbestos.[15]

---

**14.** Snook graduated from high school in 1946. He completed an electronics course at Clinton Community College in the 60s in connection with his work at du Pont.

**15.** Hospital notes from Lilly's hospitalization in 1977 suggest that doctors at Jane Lamb suspected "mesothelioma secondary to asbestos." Mesothelioma is a rare form of cancer which causes death within two years of diagnosis. There is no evidence the suspected mesothelio-

Lilly retired in 1985 due to his health. He went to Dr. Merchant in 1986 at the suggestion of his union. Dr. Merchant was the first physician to identify pleural thickening and pleural plaques caused by exposure to asbestos in Lilly's lungs. Lilly had attended the lecture given by safety director Mel Gauss in 1980, but did not connect any of his problems to asbestos exposure because "I had had, you know, supposedly some of the best doctors in the country up at Mayo, and I thought if I had had any problem with it, they surely should have found it up there." [16] Lilly continues to experience shortness of breath upon exertion and he develops chest pain on his left side when standing or sitting for long periods of time.

The magistrate found "Mr. Lilly had knowledge of his pleural thickening and exposure to asbestos by 1977," [17] and concluded the statute of limitations began to run at that time. The district court found only that Lilly had knowledge of his pleural *pain* more than two years prior to filing his current action and "with the exercise of reasonable care ... should have discovered the allegedly wrongful act" which forms the basis of this lawsuit.

### D. David Loehndorf

Loehndorf started at du Pont in 1949, shortly after his graduation from high school. He was exposed to asbestos as a slitting machine operator (the brakes contained asbestos) and in maintenance as an electrician. Loehndorf started smoking at age 20 and continues to smoke today, although he has been trying to quit and has tried various programs to help him do so. In 1974, Dr. Young noticed Loehndorf's vital capacity and flow rate were less than normal. Young's medical records note Loehndorf has a cough, and Young testified he related Loehndorf's problems to

smoking and advised him to quit. Loehndorf was also overweight. In 1979 he had rales in the lower part of his left lung, which Dr. Young attributed to bronchitis or pneumonia. Young believed he would have discussed the finding of rales with Loehndorf, but he had no notation in the file that he did so. Dr. Young believed he would have again advised Loehndorf to quit smoking.

Medical records from du Pont showed another x-ray in 1980 which Dr. Schmuck interpreted as normal. Loehndorf was not sent to Cincinnati for further evaluation as were some of the other plaintiffs, perhaps because of the normal findings. In 1981, Loehndorf was again advised to quit smoking by plant doctor Rapagnani. The records obtained by defendants contain x-ray reports from 1982, 1983, and 1984 which contain a diagnosis of pulmonary fibrosis, although there is no evidence in the record relating this diagnosis to asbestos, nor is there any evidence of what Loehndorf was told by physicians about these x-ray reports. Loehndorf testified that no doctor at du Pont ever told him his x-rays were abnormal, although he did say he has had breathing difficulties since 1982.

Loehndorf retired from du Pont in 1985. In the fall of 1985, Loehndorf contracted pneumonia. After he recovered from the pneumonia, his personal physician, Dr. Barrent, told him he could have something in his lung relating to asbestos and advised him to get another x-ray taken. Loehndorf did so, and a subsequent physician, Dr. Albin, told him "everything looks all right." Nonetheless, like Dr. Barrent, Dr. Albin thought Loehndorf could possibly have asbestos in his lungs, although she too was not sure that he did. Shortly thereafter, Loehndorf requested an examination with Dr. Merchant through his union's program.

---

ma diagnosis was conveyed to Lilly or his wife by physicians at either Jane Lamb or Mayo. More importantly, however, it is clear this was a misdiagnosis, and Lilly in fact is not suffering from mesothelioma.

**16.** Lilly has a ninth grade education.

**17.** This finding is directly contrary to the evidence of record which shows (1) Dr. Merchant was the first physician to diagnose pleural thickening and his diagnosis was in 1986; and (2) Lilly was not even generally aware of the hazards of asbestos or the extent of his contact with the substance until 1980 when he attended the Gauss lecture.

According to Loehndorf, Merchant was the first doctor to ever tell him he had an abnormal chest x-ray. Merchant's medical diagnosis is not in the record, but in 1987 a Dr. Hicklin appears to confirm a diagnosis of asbestosis.[18]

The magistrate concluded the statute of limitations began to run in 1982, when Loehndorf's medical records show a diagnosis of pulmonary fibrosis. The district court found only that more than two years prior to the instigation of their action, plaintiffs Loehndorf and his wife had knowledge of his pulmonary fibrosis and "with the exercise of reasonable care ... should have discovered the allegedly wrongful act on which they base this lawsuit."

### E.  John Kenney

John Kenney began working for du Pont in 1948 as a production worker processing wood pulp. He was exposed to asbestos as a pipe fitter on the maintenance crew from 1963 until his retirement in 1985. Like some of the other plaintiffs involved in this action, Kenney chose early retirement as part of a reduction in force which occurred when du Pont closed its cellophane plant. Prior to working for du Pont, Kenney served in the military.[19] He was injured by machine gun fire while in the service in the Philippines in 1945.[20] Since that time, physicians have told him he has pleural thickening in his left lung.

Kenney was a smoker from high school until the late 1960s, and developed chronic bronchitis at age 34, according to Dr. Young's testimony. Kenney's work records reveal he was off work in 1969 for 2½ days with fractured ribs as a result of a non-work related injury. In 1980, Kenney's x-rays were reviewed by du Pont's Wilmington doctors, and he was sent to Cincinnati for further tests. The letter Dr. Young received from the Cincinnati doctors stated Kenney's x-rays showed pleural thickening consistent with the gunshot wound and "evidence of pulmonary asbestosis." The letter also indicated Kenney had symptoms consistent with chronic bronchitis.

In discussing the results of the Cincinnati tests with Kenney, Dr. Young testified he informed Kenney the findings were consistent with asbestosis. Kenney testified Dr. Merchant was the only physician to tell him "straight out" his lung problems were caused by asbestos exposure. According to Kenney, Dr. Young and other du Pont doctors were never sure whether the pleural thickening they observed was solely related to his gunshot wound, or instead, was caused by asbestos. Nonetheless, in 1986, Kenney filled out a form in connection with his examination by Dr. Merchant in which he wrote that he was told in 1980 that his

---

18. Asbestosis is a pulmonary fibrosis caused by the walling off of asbestos particles in the lung. Symptoms do not occur until 15 or 20 years after initial exposure. *Textbook of Medicine,* at 2363–64. Eventually, the walling off process causes an accumulation of scar-like tissue which restricts lung capacity, but the early stages of the disease usually are asymptomatic. *Textbook of Medicine,* at 2363–64; *A Physician's Guide,* at 2594.

The onset of asbestosis has been described by a pulmonary physician in this way:

The main symptom of asbestosis is progressive shortness of breath. When this has its onset is in its typically insidious and gradual manner, the individual thinks that he is just getting older or getting a little overweight, can't run as fast as he used to or gets out of breath more easily than he used to; and attributes it to factors such as the ones I mentioned. A little later on, the person begins to notice that in fact, he or she can't do the things that many other people the same age can do.... As time goes on, the dependence on younger workers becomes greater and greater, until pretty soon, the individual ... really can't carry out the job without such dependence.... Eventually, in the very severe cases, a person's life consists of sitting in an armchair on the ground floor with an oxygen tank, and disconnecting it just long enough to get up and go to the bathroom. Exposure to Asbestos, 51 Fed.Reg. at 22,622. *See id.* at 22,645–66.

19. Kenney's formal education consists of high school and one year of junior college, which he attended immediately after his discharge from the Army.

20. Kenney testified he was hit by several bullets. The one that did the most damage went in the top of his left shoulder, broke several ribs, went through his left lung, and then out his back alongside his spine.

x-rays were abnormal and "asbestoeses [sic] was suspected and confirmed." Dr. Merchant's diagnosis of Kenney was mild asbestosis, based on his observations of pleural thickening and plaque formations separate from the areas of traumatic injury (his gunshot wound on the left and prior rib fracture on the right).

## IV.

In urging that summary judgment with respect to all plaintiffs was appropriate, defendants emphasize that all were aware of the hazards of asbestos prior to September, 1984, two years before their actions were commenced. Defendants correctly point out that five of the plaintiffs attended a lecture given by Mel Gauss in 1980 or 1981 on the possible diseases that could result from asbestos exposure. But, as other courts have observed, general knowledge of the hazards of asbestos is far different from knowledge that an individual plaintiff has contracted a disease caused by asbestos. *See Cowgill v. Raymark Industries, Inc.*, 780 F.2d 324, 330–31 (3d Cir. 1986).

Defendants in *Cowgill* also argued that attendance at a group discussion conducted by Mobil about asbestos-related diseases established under the "discovery rule" that a plaintiff reasonably should have known of his injury prior to August, 1981, even though plaintiff testified he was not informed by a physician of an asbestos-related condition until November, 1981. In rejecting defendants' argument, the *Cowgill* Court stated that acceptance of their contention "would be to rule as a matter of law that any individual who has been exposed to asbestos in the workplace should know he has an asbestos-related disease as of the date he learns of the health hazards posed by asbestos exposure." *Id.* at 330.

We agree with the *Cowgill* Court that such a rule is unjustified, particularly under the circumstances present in this case. At virtually the same time plaintiffs herein were attending the Gauss lecture, they were also meeting with Dr. Young, who found no lung abnormalities at all in plaintiff Kraciun; who told plaintiff Kennedy

his x-ray findings were consistent with "asbestos exposure," but would not cause him any disease, symptoms, or disability; who told plaintiff Snook he had no asbestos-related problems so long as he didn't smoke again; who believed plaintiff Lilly's health problems were not in any way connected with asbestos; and whose only conversation with plaintiff Loehndorf about lung problems related those problems to smoking.

While it is true that after 1980 plaintiffs were aware they had been *exposed* to asbestos in their work at du Pont, knowledge of exposure to asbestos alone is insufficient to establish plaintiffs knew they were *injured*. *See Lowe v. Johns–Manville Corp.*, 604 F.Supp. 1123, 1127–28 (E.D.Pa. 1985). In *Lowe*, the court refused to grant summary judgment, rejecting defendants' contention that plaintiff Lowe should have known of an asbestos-related disease when informed in 1979 that he had "pleural thickening." In addition to finding a question of fact concerning whether the plant physician had followed his "usual practice" and had informed plaintiff Lowe of his findings, the court noted that there was no evidence Lowe's case of pleural thickening had curtailed his life activities such that he should have been put on guard of a respiratory ailment. *Id.* at 1126, 1128. "In short, a physician's guidance was necessary to inform Lowe that the effects of his exposure to asbestos had become manifest in a disease." *Id.* at 1128.

Plaintiffs Kraciun, Kennedy, and Snook have cases very similar to that considered by the court in *Lowe*. While by 1987 all three plaintiffs complained of breathing difficulties, there is no evidence in the record that they experienced any significant physical symptoms prior to September, 1984, more than two years before their actions were brought. As in *Lowe*, plaintiff Kraciun's medical records show "very minimal pleural thickening" in 1982 and pleural thickening again in 1984, but Kraciun's testimony is that physicians *never identified* his condition as "pleural thickening," and when he asked about it specifically told him "not to worry."

Plaintiff Kennedy received much the same advice after his x-rays were reviewed by specialists in 1980. Both Kennedy and Dr. Young testified that Kennedy was told he had no x-ray findings which would cause him any disease, symptoms, or disability. Plaintiff Snook also had his condition reviewed by specialists in Cincinnati in 1980, after which Dr. Young informed him only that he had a "slight shadow." According to Dr. Young, Snook was not suffering any damage from his exposure to asbestos and would have no problems so long as he continued not to smoke.[21]

Defendants argue that had plaintiffs consulted a pulmonary specialist, such as they did in 1986 when they saw Dr. Merchant through their union-sponsored program, they would have discovered their injuries prior to September, 1984. But there is no evidence in this record which compels the finding that their exposure to asbestos had at that time resulted in any discernable injury or that any event had occurred which would trigger a duty to inquire further. At least one court has held that where the physical manifestations of an asbestos-related disease have not yet occurred, "discovery must mean a reasonable knowledge that they are likely to occur." *Velasquez v. Fibreboard Paper Products Corp.*, 97 Cal.App.3d 881, 159 Cal.Rptr. 113, 118 (1979).[22] Dr. Young's advice was that *no* disease was likely to occur.

Iowa courts have recognized that reliance on a physician's advice may create an issue of fact concerning plaintiff's due diligence, even when plaintiff clearly has suffered an injury. *See Baines v. Blenderman*, 223 N.W.2d 199, 202–03 (Iowa 1974).

Based on the record before us, we question whether plaintiffs Kraciun, Kennedy, and Snook even had knowledge of a *problem* "sufficient to put them on inquiry." *Cf. id.* (loss of vision after back surgery); *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 348 (Iowa 1987) (physical symptoms of fatigue, heat intolerance, headaches, nausea, numbness of feet, chest pains, and depression suffered for almost 20 years). At a minimum, however, we find questions of fact concerning whether these plaintiffs should reasonably have discovered any asbestos-related injury prior to September, 1984. *See Baines*, 223 N.W.2d at 203. *See generally Hildebrandt v. Allied Corp.*, 839 F.2d 396, 399–400 (8th Cir.1987).

Two of the remaining plaintiffs, Lilly and Loehndorf, had suffered more significant medical problems prior to 1984, but no physician had ever identified asbestos as even a possible cause of those problems prior to 1986, when they saw Dr. Merchant. Lilly's knowledge of pleural *pain* prior to 1984, which all physicians had diagnosed as completely unrelated to asbestos, cannot as a matter of law put him on "inquiry notice" of an asbestos-related injury. A jury might well conclude that Lilly acted reasonably in trusting that his physicians at the Mayo Clinic and elsewhere would discover any asbestos-related diseases in their thorough examinations.

Plaintiff Loehndorf was the only plaintiff to have ever been counseled by a physician to seek additional information about his condition, but that advice was not received until 1985, within two years of his commencement of the present action.[23] We cannot agree that as a matter of law plain-

---

**21.** Snook smoked "very lightly for probably a year" in the 1960s, and had not smoked since then.

**22.** The *Velasquez* Court held an "informed consent" is required before the statute of limitations begins to run in an asbestos-related disease case in which the plaintiff has no significant physical symptoms: "[a] brief explanation of findings and prognosis by the examining physician is necessary before it can be asserted that the patient has 'discovered' a latent or progressive disorder which has not, in all those years of

exposure, caused noticeable harm." 159 Cal. Rptr. at 118.

**23.** Loehndorf acted promptly on that recommendation, and had additional x-rays taken in January, 1986. Even the physician who reviewed those x-rays informed Loehndorf that "everything looks all right." While the record reflects a 1982 diagnosis of pulmonary fibrosis, there are many causes of pulmonary fibrosis, asbestos being only one, *see A Physician's Guide*, at 2594, and there is no indication any doctor ever even suspected asbestos was the cause of Loehndorf's pulmonary condition at that time.

tiff Loehndorf, who has a high school education, and plaintiff Lilly, who has a ninth grade education, should reasonably have known their medical difficulties were caused by asbestos prior to the time their physicians did. *See Trieschock v. Owens Corning Fiberglas Co.*, 511 A.2d 863, 866 (Pa.Super.1986). *Cf. Hildebrandt*, 839 F.2d at 399.

 Finally, we consider the evidence presented with respect to plaintiff Kenney. Kenney unquestionably knew, from the time he was injured in the military, that his left lung had evidence of pleural thickening. Moreover, Kenney had a history of breathing difficulties, which Dr. Young attributed to his smoking. Unlike the other plaintiffs involved in this appeal, however, Kenney was placed on notice as early as 1980 that his x-rays also showed asbestos-related problems. Although, according to Kenney's testimony, Dr. Young did not inform him "straight out" in 1980 that he had asbestosis, Kenney was sufficiently sure of the diagnosis that he informed Dr. Merchant "asbestoeses" [sic] "was suspected and *confirmed*" in 1980 (emphasis supplied).[24]

In cases where plaintiffs have *admitted* knowledge of an asbestos-related medical diagnosis which has caused significant injury, courts have not hesitated to grant summary judgment on statute of limitations grounds. *See, e.g., Grabowski v. Turner & Newall*, 516 F.Supp. 114, 116–18, 120 (E.D.Pa.1980), *aff'd*, 651 F.2d 908 (3d Cir. 1981). In view of the evidence presented concerning Kenney's knowledge of his asbestosis diagnosis in 1980, we agree with the district court that summary judgment was proper as to plaintiff Kenney's cause of action.

### IV.

The Iowa "discovery" rule imposes an obligation on plaintiffs to investigate once they become sufficiently aware a problem exists, and they are charged with whatever facts such an investigation would have revealed. *See generally Franzen*, 377 N.W.2d at 662–63. Plaintiffs herein all allege asbestos-related injuries, which they further allege they actually discovered only upon diagnosis by Dr. Merchant shortly before their actions were initiated. In reviewing the record presented concerning the medical conditions and the information provided to plaintiffs prior to their consultations with Dr. Merchant, we are unable to conclude as a matter of law that plaintiffs Kraciun, Kennedy, Snook, Lilly, and Loehndorf should reasonably have discovered their alleged injuries sooner. We agree with the district court, however, that summary judgment was properly granted as to plaintiff Kenney, who was "on notice" of an asbestos-related diagnosis as early as 1980. Accordingly, the judgment of the district court is reversed in part, and remanded for further proceedings.

---

24. In responding to defendants' summary judgment motion, plaintiff Kenney did not file an affidavit or otherwise explain this statement. We must view the evidence in his favor on a motion for summary judgment, but the statement on its face shows Kenney was aware of his asbestosis diagnosis. *Cf. Sparks*, 408 N.W.2d at 352.