**Joseph Michael DEANS, Petitioner,**

v.

**Gordon HETZEL, et al., Respondents.**

No. 95–3333–DES.

United States District Court,
D. Kansas.

July 20, 1998.

As Amended Aug. 13, 1998.

David J. Gottlieb, University of Kansas, Lawrence, KS, for Petitioner.

Kevin C. Fletcher, U.S. Atty's Office, Sioux, City, IA, for Respondents.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This is a petition for writ of habeas corpus, 28 U.S.C. § 2254, filed by an inmate of the Winfield Correctional Facility, Winfield, Kansas. Petitioner filed a Memorandum of Law in Support of Petition and was permitted to proceed in forma pauperis. The court issued an Order to Show Cause, and respondents filed an Answer and Return. Petitioner did not file a Traverse. Under 28 U.S.C. § 2248, the "allegations of a return ..., if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." Having examined all the pleadings and materials in the file including the records of the state criminal trial and proceedings, the court makes the following findings and order.

## FACTS

The facts are set forth in the slip opinion of the Court of Appeals of the State of Kansas on direct appeal (*State v. Deans*, 854 P.2d 320 (1993)) and petitioner's Memorandum of Law. This court finds those facts to be substantially supported by the record as follows.

1. On March 14, 1991, Joseph Michael Deans and his wife, Melody Deans, from whom he was separated, drove from Salina, Kansas, and checked into a motel room in Des Moines, Iowa. Mr. Deans testified that Ms. Deans went with him voluntarily in an attempt at a fresh start to their marriage. Ms. Deans testified that he forced her to go with him.

2. Law enforcement officers in Iowa were dispatched to a local motel to investigate a possible kidnaping by Deans of his estranged wife, Melody. The Iowa authorities had received information from police in Kansas concerning the party they were to locate, an allegation that he had taken Melody from Kansas against her will and that he was possibly armed with a weapon. The Kansas police requested that the Iowa officers locate the parties and interview them separately to determine why they were in Iowa.

3. That night, around 11:00 p.m., three Des Moines police officers arrived at the

motel room, drew their guns and knocked. Deans answered the door and in response to the uniformed officer's request, identified himself. The officers identified themselves, gave general information as to why they were there, and asked if they could come into the room. Once in the room they placed Mr. Deans against a wall and frisked him. After the pat-down search which yielded no weapon, the officers holstered their guns. Ms. Deans, who had been on the phone, was instructed to hang up and accompany one of the officers outside to a patrol car for questioning.

4. According to police officers who testified at the hearing on Deans' motion to suppress and at trial, Mr. Deans was not immediately placed under arrest; however, the two officers remaining in the room asked him to sit on the bed and questioned him "about the events of the day." Officers testified that Mr. Deans was very nervous during this questioning, and Deans testified that he was scared and confused. Tr. Suppression Hr'g, Vol. 4 at 8. The door to the motel room was closed during this questioning, and at no time did the police tell Mr. Deans that he was free to leave. They did inform Deans that they had received information that he had taken his wife from Salina against her will.

5. In response to this initial questioning, Deans repeatedly stated that he had done nothing wrong and that Ms. Deans had come with him of her own free will. After 30 to 45 minutes of questioning the Iowa police contacted Kansas authorities and were informed that an arrest warrant for kidnaping would be issued. An Iowa county attorney was then contacted and a decision made to place Deans under arrest on an Iowa charge. The officers arrested Mr. Deans, handcuffed him and transported him to the city jail. At no time did the officers give Mr. Deans his *Miranda* warnings. Mr. Deans had not previously been interrogated.

6. The next morning, Deans was removed from his cell by Iowa Detective Thomas Follett for the purpose of conducting a custodial interrogation. On the way to Follett's office, Deans stated, "I didn't think I did anything that bad but I know I have to pay the price," and that he had just come to Des Moines for the night. Follett did not respond to these comments.

7. Once they arrived in Follett's office, Follett stated his intention to give Deans *Miranda* warnings and told Deans of the allegations and charges against him. Deans told Follett that he knew "all of the rights," that he had the right to remain silent, and to an attorney. Deans also stated that he and his wife were on vacation, trying to start a new life, that he had $200 in his truck for that purpose although the money was not located, and that he had not tied up his wife in Iowa. Follett testified that these statements were unsolicited. Tr. Trial, Vol. 5 at 198.

8. Follett testified that he believed Deans had invoked his right to remain silent so he told Deans their discussion was concluded and he would be returned to his cell. Follett did not read an advisement of rights form to Deans and did not ask him any questions.

9. On the way back to the cell, Deans kept saying "I want to tell you what happened." Follett responded that he could tell his attorney. After Deans was in his cell and as Follett was walking to the elevator, Deans said "Somebody come talk to me." Follett testified that he returned to the cell and Deans said, "I don't want to talk to an attorney, I only had her tied up until we got to Solomon." Follett again responded, "Talk to your attorney."

10. The trial court held a hearing on Deans' pretrial motion to suppress his statements made to police officers at the motel and the jail. At the hearing, Follett testified that while they were in his office he did not ask Deans any questions. At trial, Follett testified he made "statements" to Deans concerning possible charges and evidence against him and discrepancies in Deans' account. Tr. Trial, Vol. 5 at 182.

11. Deans' motion to suppress was denied by the trial court which found the initial questioning of Deans at the motel was "in a non-custodial situation," there was no "substantive questioning" of Mr. Deans at the motel after arrest, and the encounter amounted to a valid *Terry* stop. Tr. Suppression Hr'g, Vol. 4 at 85–86. The court

also found that the statements made to Follett at the police station were admissible because there was no "custodial interrogation" of Deans and his statements were spontaneous and unsolicited and were not in response to questions from Follett. *Id.*, at 91–92.

12. The foregoing statements made by Deans at the motel were testified to by Iowa police officers and were admitted into evidence at trial, officers testified that Deans also told them he did not have a knife, but one was found in his car. Deans had additionally stated that they might just as well put the cuffs on him which he later explained as being said because he was always arrested when he was stopped by police.

13. Deans was found guilty after a jury trial and sentenced to imprisonment for 10 to 30 years.

**CLAIMS**

Deans claims that his custody is "in violation of the Constitution of the United States because statements he made to police without benefit of the *Miranda* warnings were admitted at trial in violation of the Fifth Amendment's privilege against self-incrimination." His claims were raised and denied on direct appeal.

**HABEAS STANDARDS OF REVIEW**

The presumably more stringent standards of review for habeas claims set forth in the 1996 amendments to 28 U.S.C. § 2254 do not apply to this action since it was pending prior to their enactment. *Lindh v. Murphy*, 521 U.S. 320, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997); *Demarest v. Price*, 130 F.3d 922, 926 (10th Cir.1997). Thus, the standards in effect at the time this action was filed govern, with state court findings of fact afforded a presumption of correctness and de novo review of legal holdings.

**MIRANDA REQUIREMENTS AND LEGAL STANDARDS**

*Miranda* requires that procedural safeguards[1] be administered to a criminal suspect prior to "custodial interrogation" in order to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). It is undisputed in this case that *Miranda* warnings were not administered to Deans at the times in question. *Miranda* warnings were designed to protect a citizen against the evils of a custodial interrogation and were not intended to unduly interfere with law enforcement's obligation to protect society. *See United States v. Griffin*, 7 F.3d 1512, 1516–7 (10th Cir.1993). In general, a statement is determined to be involuntary if coercive police activity played a significant role in inducing the statement. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473, 488 (1986). In order to make this determination, a court considers the totality of the circumstances surrounding the making of the statement. The remedy for a *Miranda* violation is suppression of the statements obtained.

Two requirements must be met before *Miranda* is applicable; the suspect must be "in custody," and the questioning must meet the legal definition of "interrogation." *Perdue*, 8 F.3d at 1463. As to the first requirement, the United States Supreme Court has explicitly instructed that *Miranda* warnings are due only when a suspect interrogated by the police is "in custody." *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Perdue*, 8 F.3d at 1463.

A person is "in custody" for the purposes of *Miranda* if he "has been deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, or his freedom of action has been curtailed to a "degree associated with a formal arrest," *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*). The "determination of whether an arrest has occurred is not dependent on whether the citizen is formally placed under arrest." *United States v. Hat-*

---

1. The *Miranda* warnings inform the suspect that he has the right to remain silent, that anything he says can be used against him and that he has the right to an attorney.

*field,* 815 F.2d 1068, 1071 (6th Cir.1987) *quoting United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir.1986), *cert. denied,* 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987). A show "of official authority such that a reasonable person would have believed he was not free to leave" indicates that an arrest has occurred. *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) *(quoting United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). The subjective intent of either the suspect or police is irrelevant to a Fourth Amendment analysis of whether a suspect is in custody. *U.S. v. Sanchez,* 89 F.3d 715 (10th Cir.1996); *Griffin,* 7 F.3d at 1519. The only relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *Perdue,* 8 F.3d at 1463, 1465; *Griffin,* 7 F.3d at 1518. There is no bright-line rule making *Miranda* inapplicable in all police-citizen encounters that do not rise to the level of a Fourth Amendment arrest. *Berkemer,* 468 U.S. at 441, 104 S.Ct. at 3151; *Perdue,* 8 F.3d at 1465. Instead, as the *Berkemer* opinion indicates, a suspect can be placed in police "custody" for purposes of *Miranda* before he has been "arrested" in the Fourth Amendment sense. *Berkemer,* 468 U.S. at 441, 104 S.Ct. at 3151; *Perdue,* 8 F.3d at 1464. Consequently, *Miranda* warnings might be implicated in certain highly intrusive, "non-arrest" encounters. *Perdue,* 8 F.3d at 1466.

■ The issue whether a suspect is "in custody," and therefore entitled to *Miranda* warnings, presents a mixed question of law and fact warranting independent review by a federal habeas court. *Thompson,* 516 U.S. at 99–100, 115–116, 116 S.Ct. at 460, 467; *see also Perdue,* 8 F.3d at 1462. Two discrete inquiries are essential to the ultimate "in custody" determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson,* 116 S.Ct. at 465. The first inquiry is distinctly factual, and state court findings on these scene-setting questions command a presumption of correctness under 28 U.S.C. § 2254.[2] *Id.* The second inquiry, however, calls for application of the controlling legal standard to the historical facts. *Id.*

■ The determination of the "in custody" prerequisite, from an examination of the totality of the circumstances, is necessarily fact intensive. *See Griffin,* 7 F.3d at 1518. Several factors are useful in testing the "atmosphere of custody." *Id.* One factor is the extent to which the suspect is made aware that he is free to refrain from answering questions. A second factor indicative of a custodial setting is the nature of questioning. While investigative detentions [3] allow for limited questioning to confirm an officer's suspicions, prolonged accusatory questioning is likely to create a coercive environment. *Id.* Another factor is the circumstances showing a "police dominated" atmosphere. *Berkemer,* 468 U.S. at 439, 104 S.Ct. at 3149; *Miranda,* 384 U.S. at 445, 86 S.Ct. at 1612. Where police are in full control of the questioning environment, custody is more easily found. Circumstances might include: separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request is

**2.** The court has previously set forth the facts found by the state courts which are supported in the record in paragraphs numbered 1 through 13, and these facts are presumed to be correct.

**3.** The Tenth Circuit Court of Appeals has identified three categories of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, (2) investigative detentions which must be supported by a reasonable suspicion of criminal activity, and (3) arrests, the most intrusive and reasonable only if supported by probable cause. *Latta v. Keryte,* 118 F.3d 693 (10th Cir.1997), *citing United States v. Davis,* 94 F.3d 1465, 1467–68 (10th Cir.1996). A defendant is not considered to be in custody under the first two categories and therefore *Miranda* warnings usually need not be given. *Griffin,* 7 F.3d at 1516.

compelled. *Griffin*, 7 F.3d at 1519. Courts have identified these and several additional factors, including prolonged retention of a suspect's personal effects and a request to accompany the officer to the police station, as ones that could lead a reasonable person to believe that he is not free to avoid an encounter with police. *Latta*, 118 F.3d at 699, *citing United States v. Sanchez*, 89 F.3d at 718; *see also Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993) (and cases cited therein). A case-by-case approach is necessary for a totality of the circumstances analysis. *Griffin*, 7 F.3d at 1519.

The second prerequisite to application of *Miranda* is that the suspect must have been subjected to "interrogation." The U.S. Supreme Court first addressed the meaning of "interrogation" in *Rhode Island v. Innis*, 446 U.S. at 297, 301, 100 S.Ct. at 1688-9. Not all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. *Innis*, 446 U.S. at 299, 100 S.Ct. at 1689. The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination. *Innis*, 446 U.S. at 299, 100 S.Ct. at 1688. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. *Id.*, at 300, 100 S.Ct. 1682, *citing Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *Innis*, 446 U.S. at 299-300, 100 S.Ct. at 1689. The police must do more than simply listen: "the defendant must demonstrate that the police ... took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986). Thus, it is clear that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custo-dy is subjected to interrogation; and "interrogation" as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. *Innis*, 446 U.S. at 300, 100 S.Ct. at 1689.

■ The *Innis* Court further concluded that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *Id.* at 300-301, 100 S.Ct. 1682. That is to say, the term "interrogation" under *Miranda* refers not only to express police questioning but also to police practices that the "police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689-90; *Perdue*, 8 F.3d at 1464. Since the police surely cannot be held accountable for unforeseeable results, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301-2, 100 S.Ct. at 1690.

## DISCUSSION

■ The facts of this case present two separate and discrete police/citizen encounters. The first encounter occurred in a motel room being rented and occupied by the suspect. Deans obviously had reason to remain in the room other than police coercion. When a person has no desire to leave the place of questioning, the degree to which a reasonable person would feel that he could leave is not an accurate measure of the coercive effect of the encounter. *See Florida v. Bostick*, 501 U.S. 429, 435-6, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Since Deans' freedom of movement was restricted by a factor independent of police conduct, the "free to leave" analysis is not highly significant. He was not prevented from leaving and did not try to leave.

While it is undisputed that Deans was not told he could leave; this is not controlling but is merely one factor to be considered. The U.S. Supreme Court has held that it would be unrealistic to require police officers to always inform detainees that they are free to

go before a consent to search may be deemed voluntary. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). The Tenth Circuit Court of Appeals has held that a police officer's failure to inform a suspect that interaction with the officer was voluntary did not violate the Fourth Amendment. *Sanchez*, 89 F.3d at 718. Thus, it surely is not required that a police officer specifically inform a suspect that he is free to leave at anytime during brief investigative questioning.

The Iowa police officers' request to enter the room and question Deans was not shown to be overly forceful or coercive. Although officers entered with guns drawn, it was because they had information that Deans was armed. The guns were holstered immediately after the suspect was searched for a weapon and none was discovered. There is no evidence that the pat-down was other than permissible and appropriate for personal safety.

Officers were not said to have used aggressive language or tone in communicating with Deans, to have had physical contact with him, or to have obtained or retained any of his personal effects except after a valid arrest.

Since a few of the factors which may signify coercion were present to some extent in the initial questioning of Deans the officers would have been wise to have administered *Miranda* warnings at the motel. However, this court holds that this initial questioning of Deans at the motel amounted to an investigative detention; and concludes that, under the totality of the circumstances, the conduct of the Iowa police officers prior to Deans' arrest would not have communicated to a reasonable person that he was not free to leave or otherwise terminate the encounter. *Latta*, 118 F.3d at 699, *citing Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

▮ Law enforcement officers may briefly detain a traveler to pursue a limited course of investigation provided the officers have a reasonable, articulable suspicion justifying the intrusion. *Griffin*, 7 F.3d at 1517, *citing United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Generally, *Miranda* warnings are not implicated in the context of a valid investigative detention or *"Terry* stop" because the typical police-citizen encounter envisioned by the *Terry* Court is non-coercive, involving no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and a "substantially less police dominated" atmosphere than that at issue in *Miranda*.[4] *Perdue*, 8 F.3d at 1464.

The detention and questioning of Deans at the motel were clearly justified by the officers' well-founded suspicions that Deans had abducted his estranged wife. There are insufficient facts indicating that this interrogation was protracted or impermissibly coercive. Under the facts of this case, this court concludes that Deans was not "in custody" prior to his actual arrest and that the failure to administer *Miranda* warnings at the motel did not require suppression of the statements made by Deans at that time.

The second encounter with police in which Deans made incriminating remarks occurred the day after petitioner's arrest during his detention at the jail. While Deans was unquestionably in custody during this encounter, he does not allege that it involved interrogatory questions.

The issue as to petitioner's encounter with officer Follett at the jail is whether the suspect was "interrogated." To resolve this issue, the court must inquire whether Officer Follett asked questions or made remarks which were "reasonably likely to elicit an incriminating response." *Perdue*, 8 F.3d at 1465, *citing Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. It is undisputed that the first prong of the definition of "interrogation" was not satisfied, since the conversation between officer Follett and Deans included no express questioning of the suspect. This claim thus boils down to whether, in the context of their brief conversation, Officer Follett should have known that Deans would suddenly be moved to make self-incriminating remarks. *See Innis*, 446 U.S. at 303, 100 S.Ct. at 1691.

---

4. It has been recognized that *Miranda* rights can be implicated during a valid *Terry* stop. *See Perdue*, 8 F.3d at 1464, 1465. However, this case does not involve the amount of force or coercion at necessary to render the detention custodial.

This court is not presented with any evidence that Officer Follett should have known that it was reasonably likely that Deans would make incriminating statements. Moreover, the record in no way suggests that Officer Follett's statements to Deans were designed to elicit a response. The court concludes that petitioner has not established that his incriminating statements were the product of words or actions on the part of police that they should have known were reasonably likely to elicit an incriminating response from him and that Deans was not "interrogated" by officer Follett within the meaning of *Miranda*. Since petitioner's statements to Officer Follett were not compelled, they were properly admitted into evidence at trial.

### HARMLESS ERROR

Had this court found a constitutional violation, such errors during trial do not necessarily require reversal of a conviction. *Perdue*, 8 F.3d at 1469. The Supreme Court has applied harmless error analysis to a wide range of constitutional errors, including the admission of unlawful confessions. *Perdue*, 8 F.3d at 1469, *citing Arizona v. Fulminante*, 499 U.S. 279, 306–7, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991). To hold that a federal constitutional error was harmless, the federal habeas court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). This court finds from its review of the evidence presented at trial that the incriminating statements made by Deans were unimportant in relation to everything else the jury considered in finding Deans guilty. *See Perdue*, 8 F.3d at 1469.

The Court concludes that petitioner has not shown that his detention is in violation of the Constitution or laws of the United States and is not entitled to federal habeas corpus relief.

IT IS THEREFORE BY THE COURT ORDERED that this action is dismissed and all relief denied.