PEOPLE v SEXTON (ON REMAND)

Docket No. 177061. Submitted September 21, 1998, at Lansing. Decided
July 13, 1999, at 9:00 A.M. Leave to appeal sought.

Corey E. Sexton pleaded guilty in the Oakland Circuit Court, Steven
N. Andrews, J., of second-degree murder and of possession of a
firearm during the commission of a felony, conditioned on the right
to appeal the trial court's denial of a motion to suppress evidence
of five inculpatory statements he gave to the police. The Court of
Appeals, FITZGERALD, P.J., and HOLBROOK, JR., and E. R. POST, JJ., in
an unpublished opinion per curiam, issued December 20, 1996
(Docket No. 177061), reversed and remanded the case to the trial
court, holding that the first three statements were admissible evi-
dence, but that under the authority of *People v Bender*, 452 Mich
594 (1996), the last two were not because before the defendant
gave those statements, the police failed to inform the defendant
that retained counsel was available to consult with him, thereby
precluding an intelligent waiver of the right to counsel and the
right to remain silent. The people appealed to the Supreme Court,
which reversed and remanded the case to the Court of Appeals,
holding that *Bender* applies only to interrogations that occurred
after July 23, 1996, and does not apply to this case, where the inter-
rogations occurred on September 8, 1993. 458 Mich 43 (1998).

On remand, the Court of Appeals *held*:

1. The admissibility of evidence of the defendant's first three
statements to the police is unaffected by the Supreme Court opin-
ion in this case.

2. The defendant was entitled to the rights enumerated in
*Miranda v Arizona*, 384 US 443; 86 St Ct 1602; 16 L Ed 2d 694
(1966), at the time of his fourth and fifth statements to the police
inasmuch as he was in custody at those times, given that he could
have reasonably believed at the time of the fourth statement that
he was not free to leave the police station and given that he was
already under arrest at the time of the fifth statement. The defend-
ant's oral and written waivers of *Miranda* rights before his fourth
and fifth statements cannot be characterized as involuntary, not-
withstanding the fact that he was held incommunicado for over
nine hours and subjected to accusatory interrogation.

3. The defendant's fourth and fifth statements were obtained in violation of his due process rights as guaranteed by the Fourteenth Amendment, and evidence of those statements must be suppressed, because the statements were involuntary, considering the totality of the circumstances under which they were given. The circumstances included police hindrance of an attorney's attempt to consult with the defendant and halt interrogation, the prolonged and accusatory nature of the interrogation, the holding of the defendant incommunicado, lack of prior experience or contact by the defendant with the police, and the defendant's disability in the form of auditory processing lag and low IQ.

Reversed and remanded.

MURPHY, J. dissenting, stated that the trial court's denial of the motion to suppress evidence of the defendant's statements should be affirmed because of the lack of a definite and firm conviction that the trial court erred in finding that the statements were freely and voluntarily given, considering the totality of the circumstances.

1. CRIMINAL LAW — *MIRANDA* WARNINGS —. Custody.

The warnings required by *Miranda v Arizona*, 384 US 443; 86 S Ct 1602; 16 L Ed 2d 694 (1966), need be given only where there has been such a restriction on a person's freedom as to render the person in custody.

2. CRIMINAL LAW — EVIDENCE — SELF-INCRIMINATING STATEMENTS — FIFTH AMENDMENT RIGHTS — WAIVER.

Statements of an accused made during custodial interrogation are inadmissible unless the accused. voluntarily, knowingly, and intelligently waives Fifth Amendment rights; whether a waiver is deemed voluntary is determined by examining the totality of the circumstances surrounding the interrogation.

3. CRIMINAL LAW — EVIDENCE — SELF-INCRIMINATING STATEMENTS — DUE PROCESS — VOLUNTARINESS.

The totality of the circumstances must be considered in determining whether a self-incriminating statement is voluntary for purposes of due process, as guaranteed by the Fourteenth Amendment; the totality of the circumstances includes the age of the accused, the accused's lack of education or the accused's intelligence level, the extent of the accused's previous experience with the police, the repeated and prolonged nature of the questioning, the length of the detention of the accused before the statement in question was given, the lack of any advice to the accused of constitutional rights, whether there was an unnecessary delay in bringing the accused before a magistrate before the confession was given, whether the accused was injured, intoxicated or drugged, or in ill health when

the statement was given, whether the accused was deprived of food, sleep, or medical attention, whether the accused was physically abused, and whether the accused was threatened with abuse (US Const, Am XIV).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *David Gorcyca*, Prosecuting Attorney, and *Kathryn G. Barnes*, Assistant Prosecuting Attorney, for the people.

*Robyn B. Frankel*, for the defendant.

ON REMAND

Before: FITZGERALD, P.J., and HOLBROOK, JR., and MURPHY, JJ.

HOLBROOK, JR., J. This case is before us following remand from the Supreme Court. Originally, we held that pursuant to the then recently decided case of *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996), two statements made by defendant had to be suppressed because they were made after the police failed to inform defendant that counsel had been retained to represent him. *People v Sexton*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 1996 (Docket No. 177061). Subsequently, our Supreme Court held that the decision in *Bender* was only to be given prospective application, and thus was inapplicable to defendant's case. *People v Sexton*, 458 Mich 43, 68; 580 NW2d 404 (1998). The Supreme Court then remanded the case to this Court for further proceedings. Once again, we reverse and remand.

I

On September 8, 1993, defendant's cousin, Damian Phillips, was shot and killed at defendant's residence. When the police arrived, they encountered defendant and two other males, one of whom was a juvenile. The three were placed in a patrol car, where they were questioned by one of the responding officers. The three were then transported to the Hazel Park police station, where they were asked to give written statements. None of the three were handcuffed or placed under arrest at the time.

The three arrived at the police station at about 2:00 P.M. They were taken into a secure area of the station house, where they were promptly given an atomic absorption test. They were then separated so that they could be interviewed individually. Defendant was questioned by Detective Melvin Marchlones. Defendant gave Marchlones his first statement at approximately 2:23 P.M. In this first statement, defendant denied all culpability in the killing. Approximately one hour later, defendant asked if he could telephone his father. Defendant was told that he could do so "later." No such call was ever made. Marchlones then confronted defendant with what the detective said were inconsistencies between what defendant told the police officer who questioned him at the scene and what he had just told Marchlones. The detective also told defendant that his story was allegedly inconsistent with that told by the two other males. Defendant then gave Marchlones a second statement at about 4:00 P.M. In this second statement, defendant claimed that as he was handing the gun to his cousin, the gun slipped through his cousin's hands, fell to the floor, and accidentally discharged.

Next, at about 5:15 P.M., Marchlones brought up the possibility of defendant taking a polygraph examination. When defendant indicated a willingness to take a polygraph test, Marchlones read defendant the *Miranda*[1] warnings so that defendant would be familiar with them when they were given to him at the polygraph examination. The record indicates that defendant did not waive his *Miranda* rights at this time. Defendant then gave a third statement at about 5:20 P.M., after Marchlones once again told defendant that his previous statement was not in accord with the facts. In this third statement, defendant claimed that as he was holding the gun, it accidentally discharged after his cousin pointed the barrel at his own head.

In the meantime, the juvenile male returned to defendant's house. According to defendant's father, the boy informed him that defendant "was being held for first-degree murder." Defendant's father went down to the Hazel Park police station at approximately 4:45 P.M. and tried to see his son. His requests were denied. Defendant's father then contacted his attorney, Neil Miller, at about 5:00 P.M. Soon thereafter, Miller called the Hazel Park police station from a mobile telephone. Miller identified himself as being defendant's attorney. According to Miller, he was told that defendant was not at the station. Miller "left a message for whoever was holding Corey to" call him. No such call was made. At about 6:00 P.M., defendant was transported to the Southfield police station to undergo the polygraph examination.

Miller arrived at the Hazel Park police station at around 7:00 P.M. He was told by the desk officer that

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

defendant was at another police station undergoing a polygraph examination. While there is some confusion in the record with regard to exactly what the officer told Miller, both men agree that Miller was misinformed about defendant's whereabouts. The desk officer refused Miller's request to contact Marchlones. Miller then left the station and returned to his office. The polygraph examiner testified that his pretest examination of defendant began at 7:13 P.M. Just before the pretest examination, the examiner read defendant the *Miranda* warnings, and defendant waived his rights by so indicating on a standard waiver form. Before the test began, defendant told the examiner that the shooting had been an accident. Marchlones estimated that the polygraph examination lasted somewhere between 3½ and 4 hours.

During the course of the examination, the desk officer at the Hazel Park police station paged Marchlones. The desk officer testified that he did so because Miller was "becoming a little bit agitated and quite pressing." Marchlones answered the page, but he did not pass on to defendant the information that an attorney had been retained to represent him. According to the testimony of Marchlones and the desk officer, their conversation took place sometime between 10:00 P.M. and 10:30 P.M. Around 10:20 P.M., Miller handed the desk officer a piece of paper on which the attorney had written, "I represent Cory Sexton. Please cease any questioning of Corey Sexton immediately." The note was addressed to both the desk officer and Marchlones. The desk officer testified that he "forwarded" the note on to Marchlones. After presenting the desk officer with this note, Miller then placed a number of telephone calls from his

mobile telephone trying to find defendant. Miller's
attempt to locate defendant was unsuccessful.

After the polygraph examination ended, the exam-
iner informed defendant that the polygraph indicated
that defendant was not being truthful about the
shooting. According to the examiner, defendant then
made the following statement (defendant's fourth
statement):

> I picked up the gun and was holding the gun and aiming
> it at his body. . . . I was about four feet away. He reached
> down for the gun, put it to his forehead, everything went
> blank, and I pulled the trigger. He didn't pull the trigger. I
> did. I knew the gun was loaded. I yelled, "I killed my . . . .
> fucking cousin."

Marchlones testified that he overheard this admission.
Marchlones then placed defendant under arrest and
read him his *Miranda* rights. Marchlones testified
that defendant waived those rights and repeated the
story he had told the polygraph examiner. This fifth
and final statement was made at about 11:35 P.M.
Defendant was then returned to the Hazel Park police
station, where he spoke with his attorney for the first
time at approximately 12:30 A.M.

In our previous opinion, we concluded that defend-
ant's first three statements could be entered into evi-
dence. That holding was unaffected by the Supreme
Court's holding. Our analysis, therefore, is focused
solely on defendant's final two statements.

II

Defendant raises a two-pronged challenge to the
admissibility of the statements. First, defendant
argues that his waivers of *Miranda* rights were inef-

fective because they were involuntary. Second, he argues that the two statements were not voluntarily made.

A

We begin our analysis of the waiver issue by looking to see if defendant was in custody at the time the waivers were made. *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966) (observing that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination"). Accord *People v Blackburn*, 135 Mich App 509, 517; 354 NW2d 807 (1984). If defendant was not in custody at the time, then *Miranda* is not applicable. *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977) (observing that the *Miranda* warnings need be given only "where there has been such a restriction on a person's freedom as to render him 'in custody' ").[2]

With respect to the fifth statement, there is no question that defendant was in custody when it was made, as Marchlones testified that he placed defendant under arrest just before taking this statement. The fourth statement, however, was made just before defendant was arrested. Accordingly, we must examine the totality of the circumstances surrounding

---

[2] The type of questioning that defendant was subjected to clearly fits the definition of "interrogation" established by the United States Supreme Court in *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980).

defendant's detention in order to determine if he was "deprived of his freedom of action in a meaningful way. . . . The key question is whether the defendant could reasonably believe he was not free to leave." *Blackburn, supra* at 518. Accord *People v Williams,* 171 Mich App 234, 237; 429 NW2d 649 (1988). After reviewing the record, we conclude that defendant could have reasonably believed he was in custody when he made his fourth statement. The statement was taken from defendant at the Southfield police station. The statement was made at approximately 10:30 P.M., after defendant had undergone interrogation for approximately eight hours. See *United States v McKinney,* 88 F3d 551, 554 (CA 8, 1996) (noting that the length of the interrogation and the site of the interrogation are two factors to be considered when evaluating whether a detention was custodial). Further, the character of the interrogation can best be described as accusatory. See *Deans v Hetzel,* 15 F Supp 2d 1067, 1071 (D Kan, 1998). Defendant was repeatedly told that his version of the shooting was untrue and not in accord with the known facts. He was also told by the polygraph examiner that the examination indicated that he had been lying. See LaFave & Israel, Criminal Procedure (2d ed), § 6.6(f), p 323 ("And surely a reasonable person would conclude he was in custody if the interrogation is close and persistent, involving leading questions and the discounting of the suspect's denials of involvement.").

We believe a reasonable person in defendant's place would also have understood by the time the polygraph examination was administered that he was being interrogated as a suspect, not as a witness. As the United States Supreme Court observed in *Stans-*

*bury v California*, 511 US 318, 325; 114 S Ct 1526; 128 L Ed 2d 293 (1994):

> [A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

Defendant had just been questioned about the shooting while hooked up to a polygraph machine. He was at the second police station he had been in that night, in an area not open to the public. He had been told that the polygraph examination showed that he had lied when denying culpability in the killing. We believe that a reasonable person in the same circumstances would understand both that he was the suspect of the investigation and that his freedom to leave was severely restricted.[3]

We also note that defendant had been held incommunicado up to the time he made his final two statements. His request to telephone his father had been denied, and both his father and his attorney had been denied access to him. Along with the other factors just examined, we believe these circumstances would

---

[3] In *People v Hill*, 429 Mich 382; 415 NW2d 193 (1987), the Michigan Supreme Court expressly rejected the so-called "focus test" of *Escobedo v Illinois*, 378 US 478; 84 S Ct 1758; 12 L Ed 2d 977 (1964). An examination of whether the knowledge that one is a suspect affects a reasonable person's view of his freedom of action does not conflict with the holding of *Hill*. We are not examining the police officer's subjective view of defendant, but rather whether that view "affect[s] how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her" freedom to leave. *Stansbury, supra* at 325.

convey to a reasonable person the notion that the interrogation was entirely under the control of the police. See *McKinney, supra* at 554 (observing that "whether the atmosphere of questioning was police dominated" is relevant to the determination if a suspect is in custody); *Hetzel, supra* at 1071. Finally, we believe that defendant's arrest following the questioning also weighs in favor of finding that he was in custody when the fourth statement was made. *McKinney, supra* at 554.

B

"Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives his Fifth Amendment rights." *People v Howard*, 226 Mich App 528, 538; 575 NW2d 16 (1997). Whether a waiver is deemed voluntary is determined by examining the totality of the circumstances surrounding the interrogation. *Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986); *People v Garwood*, 205 Mich App 553, 556; 517 NW2d 843 (1994).

We believe that whether the *Miranda* waivers at issue were voluntary is a close question. As previously noted, defendant was held incommunicado for over nine hours, and subjected to a series of accusatory interrogations. This is the type of coercive police behavior that was of particular concern to the *Miranda* Court. *Miranda, supra* at 476. Conversely, defendant did expressly waive his *Miranda* rights in both a written and an oral statement. There is also no evidence that defendant was subjected to any physical pressure. For example, he apparently was given food and something to drink at his request. Given

these circumstances, we conclude that although there is evidence of police coercion, the *Miranda* waivers cannot be characterized as involuntary.

### III

#### A

A finding that the *Miranda* waivers were voluntary, however, does not mean that the two statements necessarily pass constitutional muster. As the United States Supreme Court observed in *Miller v Fenton*, 474 US 104, 110; 106 S Ct 445; 88 L Ed 2d 405 (1985), "even after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations, . . . the Court has continued to measure confessions against the requirements of due process." Accord *Colorado v Connelly*, 479 US 157, 163; 107 S Ct 515; 93 L Ed 2d 473 (1986) ("The Court has retained this due process focus, even after holding . . . that the Fifth Amendment privilege against compulsory self-incrimination applies to the States."); *New York v Quarles*, 467 US 649, 655, n 5; 104 S Ct 2626; 81 L Ed 2d 550 (1984) ("As the *Miranda* Court itself recognized, the failure to provide *Miranda* warnings in and of itself does not render a confession involuntary, . . . and respondent is certainly free on remand *to argue that his statement was coerced under traditional due process standards.*" [emphasis added]).[4] Defendant argues

---

[4] See also *United States v McCurdy*, 40 F3d 1111, 1118 (CA 10, 1994) (observing that a court reviewing the admissibility of a defendant's statements "must determine both whether the officers complied with *Miranda* . . . and whether the defendant's post *Miranda* statements were voluntary within the meaning of the due process clause"); *United States v Bradshaw*, 290 US App DC 129, 133; 935 F2d 295 (1991) (observing that the

that the statements were involuntary under a due process analysis. We agree.

B

Whether a statement is deemed to be voluntary under the Fourteenth Amendment is "determined using a totality-of-the-circumstances analysis." *Sexton, supra*, 458 Mich 66. Accord *Haynes v Washington*, 373 US 503, 513; 83 S Ct 1336; 10 L Ed 2d 513 (1963). While the issue of the voluntariness of a waiver under *Miranda* also requires an examination of the applicable circumstances, this does not mean that the two examinations are necessarily coextensive. In other words, the constellation of relevant circumstances are not identical for each analysis. But see *Derrick v R S Peterson*, 924 F2d 813 (CA 9, 1991).[5] The difference stems from the difference in

---

Due Process Clause of the Fourteenth Amendment "requires that a confession be voluntary quite apart from whether or not *Miranda's* prophylactic procedures are followed"); LaFave & Israel, Criminal Procedure (2d ed), § 6.1(c), p 293 ("This is not to suggest . . . that today the admissibility of an incriminating statement is determined only by application of the *Miranda* rules . . . . As for the 'voluntariness' due process test, it is always worthy of consideration . . . .").

[5] The *Derrick* court examined the voluntariness of a confession under both *Miranda* and the Due Process Clause of the Fourteenth Amendment. The court first concluded that the defendant's confession was voluntary under the Due Process Clause. *Id.* at 819. It then stated that "because we have already concluded that [the defendant's] confession was voluntary under the fourteenth amendment, we hold that his waiver of his *Miranda* rights was voluntary." *Id.* at 820. We believe that this approach is misguided.

As support for its handling of the voluntariness issue, the *Derrick* court quoted the following passage from *Connelly*: "There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." *Derrick, supra* at 820, quoting *Connelly, supra* at 169-170. We do not believe that this statement means that there is but one voluntariness examination that needs to be made under both *Miranda* and the

the central question being asked. In making the *Miranda* analysis, the question is whether the *waiver* was voluntary; in the Fourteenth Amendment analysis, the question is whether the *confession* was voluntary, or whether it was obtained in circumstances that "shock[] the sensibilities of a civilized society." *Moran, supra* at 433-434.

With regard to the conduct of the police vis-à-vis a defendant's attorney, *Moran* indicates that such conduct is not relevant to the question of the voluntariness of the *Miranda* waiver, but is relevant to the question whether the defendant was deprived of the fundamental fairness that is guaranteed by the Due Process Clause. See also *Sexton, supra* at 65-66.

In *Moran*, the defendant was unaware that (1) his sister had called the Public Defender's Office to retain counsel for him, (2) an attorney had called the police

---

Fourteenth Amendment. In *Connelly*, the Court was addressing the defendant's assertion that because his "mental state . . . at the time he made the confession, interfered with his 'rational intellect' and his 'free will,'" his confession was involuntary under both *Miranda* and the Fourteenth Amendment. *Connelly, supra* at 159. The *Connelly* Court concluded that absent any showing of coercive police activity, the defendant's psychosis alone did not justify a finding that the confession was involuntary under the Due Process Clause. *Id.* at 164. "Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained." *Id.* at 166.

It was in this context that the Court observed that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." Accordingly, we conclude that the *Connelly* Court was indicating that there was no reason to require that a defendant's waiver of his *Miranda* rights be invalidated "whenever the defendant feels compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow from the police." *Id.* at 170. However, holding that the "free will" rationale would not be applied in either the *Miranda* or the due process examinations is not the same as saying that the two voluntariness examinations are coextensive.

holding the defendant and informed an unidentified person that the defendant was represented by another attorney in the office, and that the attorney on the phone would represent the defendant if he were to be interrogated, and (3) the unidentified person had told the attorney on the phone that the police would not be questioning the defendant that night. The *Moran* Court observed that the voluntariness of the *Miranda* waiver was not at issue because "the record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements." *Id.* at 421. The *Moran* Court did examine the handling of the defendant's attorney, but only did so in the context of examining whether the waiver was knowingly and intelligently made:

Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. Nor was the failure to inform respondent of the telephone call the kind of "trick[ery]" that can vitiate the validity of the waiver. Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, *such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.*

*       *       *

[W]hile we share respondent's distaste for deliberate misleading of an officer of the court, reading *Miranda* to forbid police deception of an *attorney* "would cut [the decision] completely loose from its own explicitly stated rationale." [*Id.* at 423-424 (citations omitted; emphasis added).]

However, the *Moran* Court did consider the handling of the defendant's attorney in the context of its due process examination. *Id.* at 432. Although the *Moran* Court did not find a due process violation, it did note that under different circumstances police handling of retained counsel "might rise to a level of a due process violation." *Id.*

For the Fourteenth Amendment analysis, the following factors should also be considered:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

Looking at the totality of the circumstances, we conclude that neither defendant's fourth nor fifth statement was voluntary. Attorney Miller first tried to contact those questioning defendant sometime after 5:00 P.M. Even after Miller arrived at the Hazel Park police station, he was intentionally kept from contacting defendant either directly or indirectly. Indeed, he was actually misinformed about defendant's location.[6]

---

[6] While there is no direct evidence that the desk officer intentionally misled Miller about defendant's location, there is also no evidence that the officer ever attempted to determine defendant's whereabouts. In fact, the

Ultimately, Marchlones was informed of Miller's attempts to contact defendant. However, Marchlones decided that he would not pass that information on to defendant, who was at that time in the midst of the crucial polygraph examination. All of Miller's requests that defendant's interrogation be stopped until Miller could speak to him were ignored. The desk officer indicated that he delayed informing defendant about Miller's presence because the officer did not want defendant's interrogation to be interrupted. We agree with the Michigan Supreme Court that such behavior on the part of the police is "reprehensible." *People v Wright*, 441 Mich 140, 155; 490 NW2d 351 (1992).[7] An attorney's attempt to consult with a client is not an unwarranted interruption to the criminal justice process, and attempts to frustrate such contact must not be encouraged.

Further, the prolonged and accusatory character of the interrogation, and the holding of defendant incommunicado, contributed to establishment of a coercive environment. See *id.* at 168-170 (BRICKLEY, J, concurring), and cases cited therein; *People v DeLisle*, 183 Mich App 713, 721; 455 NW2d 401 (1990). Defendant, who was isolated from any familial or legal support, was repeatedly told that his statements denying culpability were unsatisfactory. There is also evidence that Marchlones was aware that defendant had no previous experience with the police, including

---

officer testified that when Marchlones called him around 10:00 p.m., he never asked Marchlones where he was.

[7] We also agree with the trial court that "there is no excuse for [the desk officer's] failure to answer honestly Miller's inquiries as to defendant's whereabouts."

the unique experience of undergoing a police polygraph examination.[8]

Testimony was also presented at the hearing on the motion to suppress that defendant has a condition known as auditory processing lag. Defendant's school psychologist testified that as a result of this disability, defendant "doesn't always understand what is said to him. . . . He hears but he doesn't always integrate what he is hearing." Both Marchlones and the polygraph examiner testified that they had read the *Miranda* warnings to defendant. The fact that defendant did not indicate to the officers that he was confused is not dispositive. As the psychologist testified, if defendant did not understand something told to him, he is likely to just acquiesce, especially when the person conveying the information is an adult. The psychologist also testified that defendant's IQ is 72. This means that defendant's intellectual capacity falls into the category of borderline intellectual functioning. *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV*) (4th ed) (Washington, DC: American Psychiatric Ass'n, 1994), p 684.

Considering the totality of these circumstances, we are left with the firm and definite conviction that the trial court erred in finding that defendant's fourth and fifth statements were voluntary. *DeLisle, supra* at 719. The attendant circumstances establish that defendant's confessions were not freely and voluntarily made. *Haynes, supra* at 513. Therefore, we affirm our previous holding that the trial court's order deny-

---

[8] When asked by defense counsel if Marchlones had any knowledge of any previous contact by defendant with the criminal justice system, the officer responded that to the best of his knowledge, defendant had no such contact.

ing suppression of these two statements must be reversed.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

FITZGERALD, P.J., concurred.

MURPHY, J. (*dissenting*). I respectfully dissent. This Court's review of the issue of voluntariness must be independent of that of the trial court. *People v Robinson*, 386 Mich 551, 558; 194 NW2d 709 (1972). However, we will affirm the trial court's decision unless we are left with a definite and firm conviction that a mistake has been made. *Id.*; *People v DeLisle*, 183 Mich App 713, 719; 455 NW2d 401 (1990). Further, if resolution of a disputed factual question turns on the credibility of witnesses or the weight of the evidence, we will defer to the trial court, which had a superior opportunity to evaluate these matters. See *People v Marshall*, 204 Mich App 584, 587; 517 NW2d 554 (1994).

In evaluating the admissibility of a particular statement, we review the totality of the circumstances surrounding the making of the statement to determine whether it was freely and voluntarily made in light of the factors set forth by our Supreme Court in *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988):

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate

before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [Citations omitted.]

After examining the totality of the circumstances surrounding defendant's statements, I am not left with a definite and firm conviction that the trial court erred in finding that the statements were freely and voluntarily given. Therefore, I would affirm the decision of the trial court.

The trial court found that defendant was treated fairly by the investigating officers throughout his interrogation. Defendant was provided with food and water and was told on at least two occasions that he was not under arrest and could leave at any time. Defendant himself testified that he was treated fairly by the officers and that he was not coerced in any manner into making the challenged statements. Defendant was also advised of his *Miranda*[1] rights and, as the majority correctly concludes, voluntarily waived those rights before making the challenged statements. Although there was evidence that defendant suffers from an auditory processing disorder and that he has below average intelligence, the trial judge, who was in the best position to observe defendant's

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

demeanor, noted that defendant, while testifying in this matter, understood the questions presented to him and responded to those questions in an appropriate manner. Finally, although the police failed to inform defendant that he had counsel available during his interrogation, failed to disclose defendant's whereabouts to defense counsel, and failed to heed defense counsel's demands that the interrogation be stopped, I am not prepared to say that, under the totality of the circumstances, these factors alone rendered defendant's otherwise voluntary statements involuntary.

Accordingly, I would affirm the decision of the trial court because I am not left with a definite and firm conviction that the trial court erred in admitting the challenged statements.